**UNITED STATES of America,
Plaintiff,**

v.

**Francisco CRUZ–MARTINEZ,
Defendant.**

**No. 06CR470–IEG.**

United States District Court,
S.D. California.

May 5, 2006.

---

US Attorney CR, U.S. Attorneys, San Diego, CA, for Plaintiff.

Jack J. Boltax, Law Offices of Jack J. Boltax, San Diego, CA, for Defendant.

## ORDER [1] DENYING PETITION FOR FORCED MEDICATION and [2] RETURNING DEFENDANT TO FMC BUTNER.

GONZALEZ, Chief Judge.

Presently before the Court is the government's petition to forcibly medicate Francisco Cruz–Martinez ("defendant").

For the following reasons, the Court denies the government's motion.

## BACKGROUND

Defendant was arrested on March 28, 2005 and charged with being a deported alien found in the United States in violation of 8 U.S.C. § 1326. According to law enforcement records, defendant has been deported to Mexico on three occasions after being found in the United States illegally. Defendant was convicted for a violation of 8 U.S.C. § 1325 in 2002 in the Southern District of California (02cr2158) and received a sentence of 18 months followed by one year of supervised release. In addition, defendant was convicted of (i) prison escape (without force) in violation of California Penal Code 4530(b) in 1997 (sentenced to 16 months imprisonment); (ii) vehicle theft in violation of California Vehicle Code 10851(a) in 1996 (sentenced to 32 months imprisonment); and (iii) assault with a deadly weapon, not a firearm, in violation of California Penal Code 245(a)(1) in 1991 (sentenced to 75 days imprisonment and three years probation).

On May 25, 2005, the Court set a competency hearing pursuant to 18 U.S.C. § 4241 for July 22, 2005 and ordered a psychological report. At that competency hearing, the Court found defendant incompetent to stand trial and committed defendant to the custody of the Attorney General for psychiatric treatment to restore competency pursuant to 18 U.S.C. § 4241(d) for a period not to exceed four months.

On August 19, 2005, the Court granted the request of FMC Butner that the four-month period of treatment begin as of defendant's arrival at FMC Butner and extend until December 7, 2005. The Court set a status hearing on defendant's competency for January 3, 2006.

On December 28, 2005, the Warden for FMC Butner transmitted the forensic eval-

uation report to the Court and counsel. In the report, the Mental Health Department at FMC Butner requested the Court to authorize the involuntary administration of antipsychotic medication to defendant.

At the January 3, 2006 status hearing, the Court ordered that defendant be returned to the Southern District of California so that defense counsel would have the opportunity to meet with defendant. The Court also set another competency hearing for March 29, 2006.

At the competency hearing, the defendant entered a plea of not guilty on the 8 U.S.C. § 1326 indictment and testified in an effort to demonstrate his competency to stand trial. The Court continued the competency hearing until April 19, 2006, to give the Government an opportunity to respond to defendant's Memorandum of Points and Authorities in Opposition to Petition for Forced Medication.

On April 19, 2006, the Court heard medical testimony from the parties. Dr. Zula, chief psychiatrist at FMC Butner, testified for the government. Drs. Yanosfky and Carroll[1] testified for the defendant.

## DISCUSSION

### A. Standard for Involuntary Medication

In *Sell v. United States*, 539 U.S. 166, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003), the Supreme Court addressed the question "Does forced administration of antipsychotic drugs to render Sell competent to stand trial unconstitutionally deprive him of his 'liberty' to reject medical treatment? U.S. Const., Amdt. 5 (Federal Government may not 'depriv[e]' any person of 'liberty ... without due process of law')" *Id.* at 177, 123 S.Ct. 2174.[2]

The *Sell* Court found that a court could constitutionally order the forced administration of antipsychotic drugs, but concluded that such instances would be "rare" and imposed rigorous prerequisites for any such order. *Id.* at 180, 123 S.Ct. 2174.

"First, a court must find that important governmental interests are at stake. The Government's interest in bringing to trial an individual accused of a serious crime is important. That is so whether the offense is a serious crime against the person or a serious crime against property." *Id.* at 180, 123 S.Ct. 2174. "Courts, however, must consider the facts of the individual case in evaluating the Government's interest in prosecution. Special circumstances may lessen the importance of that interest. The defendant's failure to take drugs voluntarily, for example, may mean lengthy confinement in an institution for the mentally ill-and that would diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime." *Id.*

"Second, the court must conclude that involuntary medication will significantly further those concomitant state interests. It must find that administration of the drugs is substantially likely to render the defendant competent to stand trial. At

---

**1.** Dr. Yanosfky is a clinical and forensic psychologist. Dr. Carroll is a forensic psychiatrist.

**2.** Because of the difficulty of the *Sell* inquiry, it is generally the practice for courts to determine whether forced medication can be justified on some other ground. Typically, courts engage in an inquiry under *Washington v. Harper*, 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) to see if forced medi-

cation can be justified by the defendant's dangerousness or own interest. *Sell*, 539 U.S. at 182, 123 S.Ct. 2174 ("There are often strong reasons for a court to determine whether forced administration of drugs can be justified on these alternative grounds before turning to the trial competence question.") However, in this case, the government has conceded that it cannot justify forced medication on *Harper* grounds. (Memo. ISO Motion at 5.)

the same time, it must find that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." *Id.* at 181.

"Third, the court must conclude that involuntary medication is necessary to further those interests. The court must find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results. *Cf. Brief for American Psychological Association as Amicus Curiae* 10–14 (nondrug therapies may be effective in restoring psychotic defendants to competence); *but cf. Brief for American Psychiatric Association et al. as Amici Curiae* 13–22 (alternative treatments for psychosis commonly not as effective as medication). And the court must consider less intrusive means for administering the drugs, e.g., a court order to the defendant backed by the contempt power, before considering more intrusive methods." *Id.*

"Fourth . . . the court must conclude that administration of the drugs is medically appropriate, i.e., in the patient's best medical interest in light of his medical condition. The specific kinds of drugs at issue may matter here as elsewhere. Different kinds of antipsychotic drugs may produce different side effects and enjoy different levels of success." *Id.*

**B. Is Medication Substantially Likely to Render Defendant Competent for Trial?**[3]

■ Involuntary medication must "significantly further" the government's in-

terest by making it substantially likely to render a defendant competent for trial without creating any side effects that would "interfere significantly" with a defendant's ability to assist counsel. *Sell,* 539 U.S. at 180, 123 S.Ct. 2174. While it is unclear what the exact percentage chance of success should be, a court in the Southern District of California has held that a 50 percent probability of success is insufficient. *United States v. Rivera–Morales,* 365 F.Supp.2d 1139, 1141 (S.D.Cal.2005). An 80 percent chance of success appears to be sufficient. *United States v. Bradley,* 417 F.3d 1107, 1115 (10th Cir.2005). Also, the Court must examine closely the government's expert testimony, in particular, its reasoning and conclusions. *United States v. Evans,* 404 F.3d 227, 233–4 (4th Cir.2005). Conclusory statements by the government's experts that antipsychotic drugs are substantially likely to render a defendant competent are inadequate. *Id.* at 242–3.

■ Defendant argues that involuntary medication is not substantially likely to make him competent because the diagnosis of his condition is uncertain. Defendant points out that FMC Butner's staff as well as his own medical experts diagnose him with a "psychotic disorder, not otherwise specified," though the Butner report also diagnoses schizophrenia. (Opp. at 5.) Defendant's expert, Dr. Yanosfky, states that "[a]t this time, there is inadequate information to make a specified diagnosis, which could specify a distinct psychotic disorder. Most significant at this time is the need to rule out a possible diagnosis of

---

**3.** There is a dispute as to the government's burden of proof. The government asserts that the standard is "clear and convincing" and points out that the Tenth and Second Circuits have taken this position. *United States v. Bradley,* 417 F.3d 1107, 1114 (10th Cir.2005); *United States v. Gomes,* 387 F.3d 157, 160 (2nd Cir.2004.) The defendant argues that

the standard should be "beyond a reasonable doubt" because the forcible administration of anti-psychotic medication is one of the "most pervasive invasions of an individual's liberty interest." The Court follows the weight of the case law in adopting the "clear and convincing" burden of proof.

schizophrenia." (Yanosfky Report at 12, Def. Ex. "C.")

The government responds that there is a substantial probability that forcible medication will return defendant to competence. As evidence, the government points to the FMC Butner Report's statement that defendant can be returned to competency through the use of antipsychotics. (Memo. ISO Motion at 7.) Additionally, Dr. Jean Zula, the chief psychiatrist at FMC Butner, testified that there is between a 70 and 80 percent likelihood of restoring defendant to competency. (Memo. ISO Motion at 7; Zula Testimony 4/19/06 at 48–51.) The basis for Dr. Zula's opinion was FMC Butner's success in restoring twenty-five out of thirty-four patients (73% rate of restoration) to competency through involuntary medication during fiscal year 2005. (Zula Testimony 4/19/06 at 48–51.)

In this case, the government has not proved by clear and convincing evidence that involuntary medication is substantially likely to render defendant competent for trial. The clear and convincing standard of evidence is stringent. *Solano v. Playgirl, Inc.*, 292 F.3d 1078, 1084 (9th Cir.2002)(stating that the "clear and convincing evidence [standard] is a heavy burden, 'far in excess of the preponderance sufficient for most civil litigation.' ") The government's evidence fails to meet this stringent standard for two interlocking reasons: [1] the government cannot convincingly establish that defendant has schizophrenia or any other specific mental condition and [2] the government has not provided sufficient evidence indicating that an individual in defendant's condition is substantially likely to become competent upon involuntary administration of anti-

psychotic drugs. First, the Government has not been able to establish by clear and convincing evidence defendant's specific psychiatric disorder. Dr. Zula diagnosed defendant with schizophrenia undifferentiated. (Zula Testimony 4/19/06 at 39.) ("Well, what I did was insisted we put in probable schizophrenia undifferentiated.") But the doctor at FMC Butner primarily charged with assessing defendant, Dr. Pyant, disagreed with Dr. Zula's analysis[4]. Dr. Pyant diagnosed defendant with a "psychotic disorder not otherwise specified" because "he was not 100 percent sure the [defendant] met the criteria for schizophrenia." (*Id.*) Further undercutting Dr. Zula's credibility, the FMC Butner report states that the available evidence is insufficient to document continuous signs of psychotic illness persisting over six months, which defendant's experts point out is a useful benchmark for diagnosing schizophrenia. (Zula Testimony 4/19/06 at 40; Butner Report at 8.) Defendant contradicted Dr. Zula's testimony with the report of Dr. Yanosfky, which states that defendant warrants a diagnosis of "Psychotic Disorder Not Otherwise Specified," but that "there is inadequate information to make a specific diagnosis, which could specify a distinct psychotic disorder." (Yanosfky Report at 12, defendant's Ex. "C.")

The failure to diagnose defendant with any certainty raises troubling questions about the accuracy of the government's medical assessment and the efficacy of its proposed treatments. As defendant's experts point out, when so little is known about a patient's condition, it is difficult to know what treatments will be successful. For example, Dr. Carroll's report, pointing to defendant's history of relatively mild

---

4. Dr. Pyant, the doctor at FMC Butner charged with assessing defendant's condition, was the "primary author" of the report submitted by the government in support of its petition. Dr. Zula, as chief psychiatrist at FMC Butner, had a supervisory role in the diagnosis of defendant. (Zula Testimony 4/19/06 at 41.)

psychosis, states that "there is not enough evidence to opine that antipsychotic medications are substantially likely to restore the Defendant to competency." (Carroll Report at 8, defendant Ex. "B.") The government attempts to answer the ambiguity in diagnosis with the assertion that the drugs it seeks to use, such as risperdal, can be used for "any type of psychotic disorder." (Zula Testimony 4/19/06 at 44.) However, such a shotgun approach is unconvincing in the context of forcible medication to restore competency and the Court finds defendant's expert testimony more persuasive on this point.

Furthermore, the Court has serious doubts about the predictive value and applicability of the government's statistic regarding the likelihood of success. Dr. Zula testified that there was a 70 percent to 80 percent chance that involuntary medication would restore defendant to competency based on the fact that 25 of 34 (73 percent) patients involuntarily medicated during fiscal year 2005 regained competency. (Memo. ISO Motion at 7; Zula Testimony 4/19/06 at 48–51.) A statistic based on such a small sample size taken over the course of one year is not compelling evidence regarding the effectiveness of treatment. As, Dr. Zula admitted in cross examination, the 73 percent statistic obviously does not represent a clinical trial or any other controlled medical experiment. (Zula Testimony 4/19/06 at 48–51.) It is not even clear that the statistic applies to individuals in defendant's condition. Presumably, the thirty-four patients cited to by Dr. Zula had a variety of mental conditions. Dr. Zula could provide no information relating to her success rate at treating individuals with "psychosis not otherwise specified," which is the condition the three experts in this case diagnosed. (*Id.*) ("Again, I can't give you a specific number, it was group of thought disordered individuals who were not competent to go to trial and responded positively and

being restored to competency. We didn't further break it down.")

Finally, defendant's two experts indicated that medication may not be useful in this case. Dr. Carroll's report stated that there was not enough evidence to opine that antipsychotic medications are substantially likely to restore defendant, noting that "Individuals with milder levels of psychosis do not always respond to medications." (Carroll Report at 8, Def. Ex. "B.") Dr. Yanofsky wrote that "forcing medication on an unwilling suspicious and paranoid patient may have negative effects especially when considering his long-term care and prognosis." (Yanofsky Report at 13, Def. Ex. "C.")

As the above discussion indicates, the Government has not met its evidentiary burden. The government has not clearly established defendant's condition. The "statistical" evidence pointed to by Dr. Zula has dubious predictive value and does not necessarily apply to individuals in defendant's condition. Additionally, defendant's two experts have contradicted each point of the Government's already weak case.

## C. Medically Appropriate

 "The court must conclude that administration of the drugs is medically appropriate, i.e., in the patient's best medical interest in light of his medical condition. The specific kinds of drugs at issue may matter here as elsewhere. Different kinds of antipsychotic drugs may produce different side effects and enjoy different levels of success." *Sell*, 539 U.S. at 180–1, 123 S.Ct. 2174. Largely for the reasons discussed above, the Court finds that the Government has not shown by clear and convincing evidence that involuntary medication would be in the defendant's best interest. The evidence does not establish defendant's condition and some statements

in the Carroll and Yanofsky reports indicate that defendant's condition may be relatively mild and not necessarily warranting medication. As a final consideration, it is uncontested between the parties that many antipsychotic drugs have severe, possibly permanent, side effects. (Zula Testimony 4/19/06 at 24–26.) [5]

## D. Section 4246 Evaluation for Dangerousness

The Government asks the Court, in the event that it does not order forcible medication, to return defendant to FMC Butner for a dangerousness evaluation pursuant to 18 U.S.C. § 4246. Defendant does not argue in opposition to this portion of the government's motion.

■ Under 18 U.S.C. § 4246, this Court has authority to return a defendant that it determines to be incompetent to a facility for an evaluation of the defendant's dangerousness. *See e.g. Rivera–Morales*, 365 F.Supp.2d at 1145–6. Since all the experts agree that defendant suffers from some sort of psychosis and defendant committed assault with a deadly weapon in 1991, the Court grants the Government's motion.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** the Government's motion to forcibly medicate defendant. The Court **GRANTS** the Government's motion to return defendant to FMC Butner for a dangerousness evaluation. Accordingly, **IT IS SO ORDERED** that the facility director at FMC–Butner shall retain custody of defendant until further notice. **IT IS FURTHER ORDERED** that the facility director at FMC Butner shall have **sixty-days** from the date defendant arrives at

FMC Butner to determine whether to file a dangerousness certification.

**IT IS SO ORDERED.**

---

**5.** Because the Court has found that the Government fails to justify involuntary medication on two separate grounds, it need not reach the issues of whether 8 U.S.C. § 1326 is a "serious crime" within the meaning of *Sell* and whether involuntary medication is medically necessary in this case.