2008-NMSC-016

179 P.3d 1214

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Dawna CANTRELL, Defendant–
Appellant.**

No. 30,250.

Supreme Court of New Mexico.

March 5, 2008.

John Bigelow, Chief Public Defender, Michael L. Rosenfield, Assistant Public Defender, Albuquerque, NM, for Appellant.

Gary King, Attorney General, Joel Jacobsen, Assistant Attorney General, Albuquerque, NM, for Appellee.

## OPINION

MAES, Justice.

{1} In this appeal we determine whether ordering Defendant to submit to involuntary antipsychotic drug treatment for the sole purpose of establishing Defendant's competency to stand trial violates Defendant's due process rights. Following the United States Supreme Court's four-part test in *Sell v. United States*, 539 U.S. 166, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003), we conclude that Defendant's due process rights were not violated, and we affirm the trial court's order.

## FACTUAL AND PROCEDURAL BACKGROUND

{2} On October 1, 2003, the Grant County Sheriff's Office received information that Defendant, Dawna Cantrell, killed her husband, Gentry Cantrell, by stabbing him with a knife; that she did so in self-defense; and that the knife was in a drawer in Defendant's van. Defendant was arrested and charged with an open count of murder and two counts of tampering with evidence.

{3} Based on an evaluation by Defendant's expert, Dr. Eric Westfried, defense counsel raised the question of Defendant's competency to stand trial. Defendant's pre-trial motion requested a neuropsychological evaluation to determine Defendant's competency to stand trial and to stay the proceedings pending a competency hearing. The court granted the motion and permitted both Defendant's expert and the State's expert, Dr. Edward Seigel, to evaluate Defendant.

{4} The experts found that Defendant suffers from a persecutory delusional disorder that causes her to believe that there is a conspiracy against her. While finding that Defendant's delusion is confined to Grant County and the perceived conspiratorial influence of two individuals, the experts determined that her delusion can become aggravated to include other persons and circumstances. The experts concluded that this delusional disorder makes it difficult for Defendant to assist her attorney in her defense. As a result of these findings, the parties stipulated that Defendant understood the nature and significance of the criminal proceedings against her and had a factual understanding of the criminal charges, meeting the first two criteria for trial competency. *See* UJI 14–5104 NMRA. The parties also stipulated that because Defendant was unable to assist her counsel in her defense, she was legally incompetent to stand trial under the third criterion for trial competency.

{5} Finding Defendant incompetent to stand trial, the court ordered Defendant to submit to a dangerousness evaluation. Dr. Siegel conducted the evaluation and issued a report in which he concluded that Defendant was not considered a dangerous person. Also in that report, Dr. Siegel commented on Defendant's competency to stand trial. Dr. Siegel noted that Defendant's mood and cognition were clearer and more controlled than during his previous evaluation of her. Dr. Siegel ascribed this improvement to Defendant's medication, which she had not been taking at the time of the previous evaluation. According to Dr. Siegel, Defendant seemed competent in a normal setting, but he believed that her anxiety would likely increase during courtroom proceedings, which would heighten her delusion. Dr. Siegel concluded that treatment with antipsychotic medication would strengthen Defendant's "psychological defenses" and establish her competency to stand trial.

{6} In response to Dr. Siegel's report, the trial court appointed a new forensic evaluator, Dr. Gerald Fredman, to re-evaluate Defendant's competency to stand trial. Dr. Fredman evaluated and interviewed Defendant and reviewed several records, including Dr. Westfried's and Dr. Siegel's evaluations. In his report, Dr. Fredman stated, "within a reasonable degree of medical certainty that [Defendant] understands the nature and significance of the proceedings against her," but

she would have difficulty assisting her attorney with her defense due to the nature of her delusion. However, it was Dr. Fredman's opinion that Defendant would be able to assist her attorney if she were treated with antipsychotic medication.

{7} Predicated on Dr. Fredman's report, the State filed a motion asking the court to order Defendant to submit to a psychiatric examination for the purpose of prescribing antipsychotic medication and treating Defendant to trial competency. At the hearing on this motion, the court heard contrary testimony from two experts, Dr. Fredman, who testified for the State, and Dr. Westfried, who testified for Defendant.

{8} Dr. Fredman testified that he based his expert opinion on his evaluation of Defendant and on his personal experience as a psychiatrist. Dr. Fredman is a licensed psychiatrist with a sub-speciality in forensic psychiatry who has several board certifications from both psychiatry and forensic psychiatry boards. Dr. Fredman has been qualified to testify as an expert in competency matters hundreds of times. Although Dr. Fredman has extensive experience, he is neither a researcher nor an author in the field of forensic psychiatry. Dr. Fredman has been in private practice for almost thirty years and estimated he has fifty to seventy-five patients. Over the course of his career, Dr. Fredman has treated ten patients who suffered from a delusional disorder.

{9} Dr. Fredman's testimony was the basis for the court's finding that Defendant could be successfully treated to competency with antipsychotic medication. Dr. Fredman testified that Defendant would benefit from a combination of therapy and antipsychotic medication.[1] Dr. Fredman stated that it was "more likely then [sic] not" that this treatment would restore Defendant's competency to stand trial. Dr. Fredman based this conclusion on his own experience in treating patients suffering from delusional disorders. Dr. Fredman testified that over half of those

patients responded favorably to treatment by showing a significant reduction in the level of their delusional symptoms.

{10} Dr. Fredman also testified concerning the medications' potential side effects that might disable defendant during trial. Dr. Fredman testified that "it's more likely then [sic] not" that such side effects would not occur with Defendant. However, Dr. Fredman advised the need for a medical assessment prior to initiating treatment, including a consultation with a cardiologist.

{11} Defendant's expert, Dr. Westfried, offered testimony based on clinical and research knowledge. Dr. Westfried is an experienced forensic psychologist whose practice exclusively consists of forensic psychology. Dr. Westfried testified that he is one of four board-certified forensic psychologists in New Mexico, and one of four hundred in the United States. As explained by Dr. Westfried, forensic psychology addresses issues of the law with research and clinical evaluations. His experience includes over one thousand forensic evaluations since 1995.

{12} Dr. Westfried's analysis was largely based on his interpretation of Defendant's thought process relating to treatment with antipsychotic medications. Dr. Westfried described Defendant as having a "tight" thought process, meaning that she could relate events in a logical, comprehensible order. Dr. Westfried explained that atypical antipsychotic medications (the type Dr. Fredman recommended for treating Defendant) are used to treat schizophrenia because they tighten the thought process by "diminish[ing] the frequency and severity of the looseness of associations." Dr. Westfried believed that antipsychotic medications would not improve Defendant's delusional symptoms because her thought process is not "loose."

{13} Dr. Westfried also countered Dr. Fredman's assertions by explaining that there is a lack of scientific literature addressing the effects of antipsychotics on delusional

1. Dr. Fredman's suggested treatment would continue Defendant's current treatment, including therapy and antidepressant medication, while adding treatment with an antipsychotic medication. Dr. Fredman specifically mentioned three antipsychotics that he would consider: Risperidone, Ziprasidone, and Quetiapine. If De-

fendant's condition improves while taking antipsychotic medication, Dr. Fredman suggested adjusting the dose over time to achieve the lowest, effective dose. Dr. Fredman thought that this treatment period would take six months to a year before a reassessment of Defendant's competency would be appropriate.

disorders in the context of competency to stand trial. He stated that there was no literature indicating that the medications Dr. Fredman recommended would have any effect on a patient suffering from a delusional disorder. Dr. Westfried expressed concern that a person suffering from a delusional disorder could be made competent to stand trial through treatment with antipsychotic medications when there is no research addressing that specific question.

{14} Relying on the United States Supreme Court's analysis in *Sell,* the trial court granted the State's motion. *Sell* articulates due process guidelines for ordering a defendant to submit to involuntary drug treatment for the purpose of achieving competency to stand trial. In this case, the trial court's order was tailored to the *Sell* factors:

THE COURT FINDS CLEAR AND CONVINCING EVIDENCE THAT:

. . . .

5) There is an important governmental interest in bringing the defendant to trial;

6) Administration of antipsychotic medication will substantially render the defendant competent to stand trial and is substantially unlikely to have side effects which will interfere significantly with the defendant's ability to assist counsel in conducting a defense;

7) The Defendant has participated in out-patient therapy for over a year and this or any other alternative, less intrusive treatments are unlikely to achieve substantially the same results;

8) Administration of antipsychotic medication is medically appropriate and in the patient's best medical interest in light of her medical condition.

*See Sell,* 539 U.S. at 180–81, 123 S.Ct. 2174. The trial court ordered Defendant to submit to a psychiatric evaluation for the purposes of selecting antipsychotic medication and monitoring Defendant's treatment with the medication. The court also ordered Defendant to take the medication as prescribed, if medically appropriate.

{15} The trial court certified the *Sell* issue for an interlocutory appeal. This Court has jurisdiction over interlocutory appeals involving pre-trial matters in criminal cases where a sentence of life imprisonment or death could be imposed. *State v. Smallwood,* 2007–NMSC005, ¶ 10, 141 N.M. 178, 152 P.3d 821. We will first review the *Sell* factors to determine the appropriateness of those standards and then determine the standard of review to apply to each factor.

## DISCUSSION

{16} In this case, Defendant was unable to assist her counsel because of her delusional disorder. The State sought a court order to have Defendant submit to antipsychotic drug treatment for the sole purpose of reducing her delusional symptoms and allowing her to assist her counsel during trial. Through the experts' reports, the trial court was aware that Defendant believed that she was being persecuted by certain individuals whose influence prevented her fair treatment in these criminal proceedings, but that Defendant was considered not dangerous to herself or others. The trial court adopted the *Sell* test to determine whether appropriate circumstances existed to support an order requiring Defendant to submit to unwanted antipsychotic drug treatment solely for the purpose of establishing Defendant's trial competency.

{17} An individual has "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." *Washington v. Harper,* 494 U.S. 210, 221–22, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990). Due process prohibits deprivation of that liberty interest unless certain preconditions are met. *See Sell,* 539 U.S. at 179, 123 S.Ct. 2174; *Harper,* 494 U.S. at 227, 110 S.Ct. 1028. *But see Riggins v. Nevada,* 504 U.S. 127, 135, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992) ("[F]orcing antipsychotic drugs on a convicted prisoner is impermissible absent a finding of overriding justification and a determination of medical appropriateness."). The criteria for determining whether involuntary treatment violates an individual's due process rights has been developed primarily in two United States Supreme Court cases: *Harper* and *Sell.*

{18} In *Harper,* the Court upheld a state's involuntary treatment policy for inmates. The policy permitted involuntary treatment with antipsychotic drugs where the prisoner (1) suffers from a mental disorder, and (2) is

gravely disabled or poses a likelihood of serious harm to himself, others, or their property. *Id.* 494 U.S. at 215, 110 S.Ct. 1028. The Court questioned whether the Due Process Clause conferred any greater rights upon the prisoner than those recognized by the policy. *Id.* at 221–22, 110 S.Ct. 1028. The Court's opinion emphasized that a due process analysis depends on the factual circumstances of the particular case. *Id.* at 220, 110 S.Ct. 1028 ("[W]hat factual circumstances must exist before the State may administer antipsychotic drugs to the prisoner against his will[?]").

{19} The Court in *Harper* considered three factors to evaluate the treatment policy:

> First, there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it. Second, a court must consider the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally. Third, the absence of ready alternatives is evidence of the reasonableness of a prison regulation, but this does not mean that prison officials have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint.

*Id.* at 224–25, 110 S.Ct. 1028 (internal quotation marks and citations omitted) (quoting *Turner v. Safley*, 482 U.S. 78, 89–91, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)). Relying on these factors, the Court held that the State's interest in combating the danger posed by a person to both himself and others is both legitimate and important, particularly in a prison environment. "[G]iven the requirements of the prison environment, the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." *Harper*, 494 U.S. at 227, 110 S.Ct. 1028. *Harper* demonstrates that the due process analysis for involuntary drug treatment is a balancing of the circumstances and the parties' interests in each individual case.

{20} In *Sell*, the United States Supreme Court created a test for determining the constitutionality of an order requiring a defendant to submit to involuntary drug treatment when the defendant "(1) is *not* dangerous *and* (2) *is* competent to make up his own mind about treatment," and the sole purpose is to make the defendant competent to stand trial. *See Sell*, 539 U.S. at 183, 123 S.Ct. 2174. The Court in *Sell* recognized that these circumstances require a unique assessment because the parties' interests are different than those where an individual poses a danger, as in *Harper*, or where antipsychotic drug treatment may be necessary for some other reason.

{21} The ultimate question in *Sell* was whether the "Government, in light of the efficacy, the side effects, the possible alternatives, and the medical appropriateness of a particular course of antipsychotic drug treatment, [has] shown a need for that treatment sufficiently important to overcome the individual's protected interest in refusing it[.]" 539 U.S. at 183, 123 S.Ct. 2174. To make that determination, the Court articulated a four-factor test: "First, a court must find that *important* governmental interests are at stake"; second, the court must conclude that involuntary medication will significantly further the government's concomitant state interests of trying a defendant for a serious crime and providing a defendant with a fair trial; "[t]hird, the court must conclude that involuntary medication is *necessary* to further those interests"; and fourth, "the court must conclude that administration of the drugs is *medically appropriate, i.e.,* in the patient's best medical interest in light of [the patient's] medical condition." *Id.* Where treatment is sought solely for trial competency purposes, a court must first find these four factors before ordering a defendant to submit to involuntary drug treatment.

{22} *Sell* further required that "a court, asked to approve forced administration of drugs for purposes of rendering a defendant competent to stand trial, should ordinarily determine whether the Government seeks, or has first sought, permission for forced administration of drugs on [alternative] *Harper-type* grounds; and, if not, why not." *Id.*

Where a defendant is treated with antipsychotic medications for a different purpose, the issue of competency becomes unnecessary. Therefore, requiring the State to first seek an alternative justification for the treatment rarefies the instances in which the *Sell* factors are necessary. *See id.* (stating that due process permits involuntary drug treatment for the sole purpose of making the defendant competent to stand trial, "[b]ut those instances may be rare"). Also, different circumstances invoke different due process protections, and this initial determination helps focus the trial court's inquiry on the proper questions when it is faced with the unique circumstances addressed in *Sell.*

{23} *Sell* recognized that under these unique circumstances, medical experts have the difficult task of "balanc[ing] harms and benefits related to the more quintessentially legal questions of trial fairness and competence." *Id.* at 182, 123 S.Ct. 2174. When the trial court is assigned the difficult task of anticipating and ruling on medical probabilities, its considerations under these circumstances are necessarily distinct from those considerations where treatment is sought for a different purpose. Failure to consider the proper questions at the trial level may result in an improper deprivation of the defendant's constitutionally-protected interest.

{24} For example, in *Sell,* the Supreme Court vacated the district court's order imposing involuntary treatment on trial competency grounds. In *Sell,* a medical center where the defendant was being held first ordered the involuntary treatment, and a magistrate affirmed the order. *Id.* at 183–84, 123 S.Ct. 2174. The medical center and the magistrate approved the treatment based on findings by the medical center's experts and "substantially, if not primarily, upon grounds of Sell's dangerousness to others." *Id.* at 183, 123 S.Ct. 2174. However, the district court and the Court of Appeals found "clearly erroneous" the magistrate's conclusion that the defendant was dangerous, and both courts approved the treatment order solely on the grounds of rendering the defendant competent to stand trial. *Id.* at 184, 123 S.Ct. 2174. According to the United States Supreme Court, because the magistrate's inquiry focused on dangerousness, "the experts did not pose important questions—questions,

for example, about trial-related side effects and risks—the answers to which could have helped determine whether forced medication was warranted on trial competence grounds alone." *Id.* at 185, 123 S.Ct. 2174. Moreover, the experts conceded that the proposed medications had "significant" side effects. *Id.* The Court recognized that where forced treatment is based on achieving trial competency, any such order must consider additional important issues such as "[w]hether a particular drug will tend to sedate a defendant, interfere with communication with counsel, prevent rapid reaction to trial developments, or diminish the ability to express emotions," but that these considerations are "not necessarily relevant when dangerousness is primarily at issue." *Id.* at 185, 123 S.Ct. 2174. Because the record did not contain the appropriate considerations in *Sell,* the Court vacated the treatment order and defined the proper test for determining when a court can order a defendant to submit to involuntary drug treatment solely for trial competency purposes.

{25} We agree that the case before us was properly evaluated in the trial court and adopt the four-factor *Sell* test as the appropriate due process standard to determine whether appropriate circumstances exist to support an order requiring Defendant to submit to unwanted antipsychotic drug treatment solely for the purpose of establishing Defendant's trial competency. To evaluate the constitutionality of the court's order, we will first define the proper standards of review, then we will apply those standards to the facts of this case.

**STANDARD OF REVIEW**

{26} The *Sell* test depends on underlying factors composed of both legal and factual issues. We review legal conclusions de novo and factual findings for sufficiency of the evidence. *See State v. Rodriguez,* 2006-NMSC-018, ¶ 3, 139 N.M. 450, 134 P.3d 737. A sufficiency of the evidence review involves a two-step process, reviewing factual questions in the context of the government's burden: First, the evidence is reviewed in the light most favorable to the State, resolving all conflicts and inferences in favor of upholding the trial court's decision; and second, a

determination is made whether the evidence, viewed in this manner, could justify a finding by any rational fact-finder that each element has been established by clear and convincing evidence. *State v. Sanders,* 117 N.M. 452, 456, 872 P.2d 870, 874 (1994); *see State v. Treadway,* 2006–NMSC–008, ¶ 7, 139 N.M. 167, 130 P.3d 746 ("The sufficiency of the evidence is reviewed pursuant to a substantial evidence standard."). Where we are confronted with mixed questions of law and fact, we give deference to the lower court's factual findings, but we review the application of the facts to the law de novo. *State v. Attaway,* 117 N.M. 141, 144–45, 870 P.2d 103, 106–07 (1994). We must, therefore, designate the type of question presented by each *Sell* factor to determine the scope of our review and the level of deference we give to the trial court's conclusions.

{27} The first *Sell* factor is a legal question. To satisfy this factor, "a court must find that *important* governmental interests are at stake." *Sell,* 539 U.S. at 180, 123 S.Ct. 2174. Adjudicating a defendant's guilt or innocence for a serious crime *is* an important governmental interest, whether the crime is against a person or property. *Id.* However, courts must also consider special circumstances that may affect that interest. *Id.* For example, in *Sell,* the Supreme Court noted certain circumstances that diminished, but did not eliminate, the government's interest. *Id.* at 186. In *Sell,* the defendant had been confined at a medical center for a long period of time, for which the defendant might receive credit toward a sentence for time served. *Id.* Also, the defendant refused to take antipsychotic drugs, which might result in further lengthy confinement and which could further reduce his likelihood of committing future crimes. *Id.*

{28} Under the second *Sell* factor, "the court must conclude that involuntary medication will *significantly further* [the government's] concomitant state interests" of achieving a defendant's trial competency and assuring that a defendant's trial is a fair one. *Id.* at 180–81, 123 S.Ct. 2174. To do so, the court "must find that administration of the drugs is substantially likely to render the defendant competent to stand trial," and "that administration of the drugs is substantially unlikely to have side effects that will

interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." *Id.* at 181, 123 S.Ct. 2174. There is some debate over how this factor should be reviewed. In the federal Courts of Appeals, the Second and Fourth Circuits have interpreted the second *Sell* factor as a factual issue. *See United States v. Gomes,* 387 F.3d 157, 160 (2d Cir.2004) ("Whether the Government's asserted interest is important is a legal question that is subject to *de novo* review. The district court's findings with respect to the other *Sell* factors are factual in nature and are therefore subject to review for clear error."); *United States v. Evans,* 404 F.3d 227, 240 (4th Cir.2005) ("We review the district court's resolution of *Sell's* second and fourth parts for clear error...."). In contrast, the Tenth Circuit has interpreted the second *Sell* factor as a legal issue that is to be reviewed de novo. *See United States v. Bradley,* 417 F.3d 1107, 1114 (10th Cir.2005) ("We would expand the parameters of the legal question to include whether involuntary administration of antipsychotic drugs 'is necessary significantly to further important governmental trial-related interests.'" (quoting *Sell,* 539 U.S. at 179, 123 S.Ct. 2174)); *United States v. Valenzuela–Puentes,* 479 F.3d 1220, 1224 (10th Cir.2007) ("*Sell's* first factor—whether important governmental interests are at stake—is reviewed de novo, as is the second factor—whether involuntary medication will significantly further those state interests .... the remaining two *Sell* factors, which depend on factual findings, are reviewed for clear error." (citation omitted)).

{29} Both parties urge us toward different standards of review. The State primarily relies on *Gomes,* and argues that the second *Sell* factor should be reviewed as a question of fact. Defendant argues that we should follow the Tenth Circuit and review the second *Sell* factor de novo.

{30} Because the second factor requires conclusions that depend on factual determinations from expert testimony, the trial judge is in the best position to weigh that testimony, and in doing so is free to accept or disregard that testimony. However, the requirements that "administration of the drugs

is substantially likely to render the defendant competent to stand trial" and that the administration of the drugs "is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense," are legal standards. Thus, the second factor is a mixed question of law and fact. *Sell,* 539 U.S. at 181, 123 S.Ct. 2174. Accordingly, we review the underlying factual findings for sufficiency of the evidence and determine whether the underlying facts meet those standards de novo.

{31} There is no dispute that the third and fourth *Sell* factors are questions of fact. The third factor requires a court to find that involuntary antipsychotic medication is necessary to further the State's interest in providing the defendant with a fair trial by finding that "any alternative, less intrusive treatments are unlikely to achieve substantially the same results." *Id.* The fourth factor requires the court to find that the proposed treatment is in the defendant's best medical interest in light of the defendant's medical condition. *Id.* These findings are of the more objective and straightforward inquiries, which the fact-finder is in the best position to determine.

{32} We also take this opportunity to clarify the government's burden of persuasion because factual questions are reviewed in the context of that burden. The government's burden of persuasion is to prove all facts by clear and convincing evidence. The Court in *Sell* did not specify the burden on the State, but courts that have considered the issue have held that facts supporting the *Sell* factors must be found by clear and convincing evidence. *See, e.g., Valenzuela–Puentes,* 479 F.3d at 1224; *Bradley,* 417 F.3d at 1114; *Gomes,* 387 F.3d at 160. We agree that the trial court must make all its findings of fact by clear and convincing evidence.

**ANALYSIS**

■ {33} Having determined the appropriate standards of review, we apply those standards to the facts and evidence adduced in this case. Defendant does not contest the trial court's findings with respect to the first or third *Sell* factors. We do not analyze those factors here other than to note that this case is unique because Defendant is not presently incarcerated or otherwise

confined, so that the circumstances of this case do not diminish the importance of the State's interest. If anything, the State's interest in trying Defendant is strengthened by these circumstances, because if Defendant is incompetent to stand trial, there will be no adjudication of Defendant's guilt or innocence of a serious crime.

{34} Concerning the second *Sell* factor, the parties argue over the proper interpretation of the "substantially likely" and "substantially unlikely" requirements. *Sell,* 539 U.S. at 181, 123 S.Ct. 2174. Defendant argues that these standards require the judge to have a high level of certainty as to the result and effects of the treatment to meet this standard. *See, e.g., United States v. Cruz–Martinez,* 436 F.Supp.2d 1157, 1161 (S.D.Cal. 2006) (holding that testimony showing there was a seventy to eighty percent likelihood that defendant would be rendered competent was not sufficient to meet the "substantially likely" requirement); *United States v. Rivera–Morales,* 365 F.Supp.2d 1139, 1141 (S.D.Cal.2005) (holding that testimony of an "over 50%" probability that defendant would be rendered competent was not enough under *Sell* ); *United States v. Ghane,* 392 F.3d 317, 320 (8th Cir.2004) (holding that testimony showing a five to ten percent chance that defendant would be rendered competent by antipsychotic drugs did .not meet the "substantially likely" standard); *People v. McDuffie,* 144 Cal.App.4th 880, 50 Cal. Rptr.3d 794, 799 (2006) (holding that testimony of a fifty to sixty percent chance defendant would be rendered competent was not enough under *Sell* ). Defendant argues that even if the State's expert were believed, under these cases, the State did not meet its burden to show by clear and convincing evidence that "administration of the drugs is substantially likely to render the defendant competent to stand trial" and "is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." *Sell,* 539 U.S. at 181, 123 S.Ct. 2174.

{35} We do not find much guidance from the numerical conclusions drawn from these cases. Therefore, we decline to assign a

number or percentage to the level of certainty by which a judge must find these two elements because we wish to avoid, to the extent possible, tailored expert testimonies. Although this Court recognizes the objectivity and predictability that could result from such an approach, we also recognize the necessity of preserving the distinct roles of experts and judges. A *Sell* hearing requires expert medical testimony on essentially legal questions. We must determine whether to place the responsibility of applying medical terminology and standards to legal conclusions on expert witnesses or on judges. If we were to place that responsibility on experts, the result would likely be testimony contoured to our formal requirements but lacking in substance. We prefer that judges interpret meaningful medical testimony in the context of the applicable legal standards.

{36} In the present case, the medical experts' testimonies were based on their diverse perspectives as either a practitioner or a researcher. On one hand, Dr. Fredman based his testimony supporting treatment for Defendant on his experience as a practicing psychiatrist who has treated patients suffering from delusional disorders. On the other hand, Dr. Westfried's perspective was that of an experienced research psychologist. Each expert provided a unique perspective and meaningful medical testimony to aid the trial court in its decision. In this case, the trial court favored Dr. Fredman's practical experience over Dr. Westfried's theoretical, research-based knowledge. Despite contradictory perspectives, the trial court can best interpret and evaluate medical evidence in the context of the applicable legal standards when the experts provide meaningful medical testimonies.

{37} The trial court made its factual findings by clear and convincing evidence. Giving the appropriate deference to the trial court's findings of fact we find that the government met its burden with respect to the second *Sell* factor. Dr. Fredman testified that adding antipsychotic medications to Defendant's current treatment regimen would, "more likely than not," establish her competency to stand trial.

{38} Dr. Fredman's testimony also allayed concerns that the antipsychotic medications' side effects would prevent Defendant from assisting her attorney, which would prevent her from having a fair trial. Specifically, Dr. Fredman testified that it would be more unlikely than not that any of the medications' side effects would prevent Defendant from assisting her counsel with her defense. In his oral findings from the bench, the trial court acknowledged the "substantial likelihood" standard and distinguished that standard from a bright-line test, stating "whether the percentages are twenty percent or thirty percent or ten percent, is not for me to decide, there's, just whether there's substantial unlikely [sic] to have side affects." Indeed, this testimony was sufficient to establish by clear and convincing evidence that administration of antipsychotic medication is substantially likely to render Defendant competent to stand trial and is substantially unlikely to have side effects which will interfere significantly with Defendant's ability to assist counsel in conducting a defense.

{39} The fourth *Sell* factor is a purely factual finding by the trial court that administration of antipsychotic medication is medically appropriate and in the patient's best medical interest. Dr. Fredman testified about the specific kinds of antipsychotics at issue and the different side effects and levels of success that could be anticipated. Based on this information, Dr. Fredman testified that if Defendant was his patient outside the legal context, he would treat her with antipsychotics in the same manner as he recommended for treating her to competency:

> [L]et's assume her competency wasn't an issue. It [sic] would still, as a psychiatrist treating somebody outside a forensic setting, antipsychotic medications would be indicated. So, even outside of a competent situation, if they, if I was treating Ms. Cantrell I would recommend an antipsychotic medications [sic] be used as part of the overall treatment.

Based on Dr. Fredman's testimony, there was sufficient evidence for the trial court to find that the suggested antipsychotic drug treatment was medically appropriate.

## CONCLUSION

{40} We hold that the trial court's order, that Defendant submit to a psychiatric evalu-

ation for the purposes of selecting and monitoring treatment with antipsychotic medication and take the medication as prescribed, if medically appropriate, does not violate Defendant's due process rights. We affirm the trial court's order.

{41} **IT IS SO ORDERED.**

WE CONCUR: EDWARD L. CHAVEZ, Chief Justice, PATRICIO M. SERNA, and RICHARD C. BOSSON, Justices, RICHARD E. RANSOM (Pro Tem).