Nakamura, Justice (concurring in part and dissenting in part). {31} An appellate court’s review of whether sufficient evidence supports a jury’s verdict is settled: We draw every reasonable inference in favor of the verdict and then evaluate whether the evidence, so viewed, supports the verdict beyond a reasonable doubt. E.g., State v. Cantrell, 2008-NMSC-016, ¶ 26, 143 N.M. 606, 179 P.3d 1214. Under this standard of review, a rational jury could have found beyond a reasonable doubt that Stephenson violatedNMSA 1978, Section 30-6-1(B) (2009) by intentionally leaving Isaiah under circumstances whereby Isaiah suffered neglect. Accordingly, I respectfully dissent. {32} The Legislature intended “leaving” and “abandoning” to create independent theories of criminal culpability under Section 30-6-1 (B). The majority concludes that, when enacting Section 30-6-1 (B), the Legislature intended “leaving” to reflect its ordinary, dictionary definitions — i.e., first, “ ‘to take leave of or withdraw oneself from whether temporarily or permanently: go away or depart from’ ” and, second, “ ‘to cause to be or remain in some specified condition.’ ” Maj. Op., ¶ 16 (quoting Webster’s Third New International Dictionary of the English Language Unabridged 1287 (1971) (emphasis omitted)). I agree that the Legislature intended “leaving” to denote these dictionary definitions. I also agree that there was insufficient evidence for the jury to convict under the first definition of “leaving”: At the time Stephenson put Isaiah to bed and locked the door, there was not sufficient evidence for a reasonable jury to conclude that she left Isaiah under circumstances in which he may have suffered or did in fact suffer neglect. {33} Yet, I disagree with the majority’s ultimate conclusion that there was insufficient evidence to support the jury’s finding that Stephenson intentionally left Isaiah under circumstances whereby he suffered neglect. At some point during the night, the dresser fell upon Isaiah and pinned his legs to the crossbar of his toddler bed. Sufficient evidence was presented at trial for a reasonable jury to find that Stephenson both apprehended that Isaiah was injured and intentionally left him in that condition. In other words, Stephenson “caused” Isaiah “to remain in some specified condition” — i.e., pinned underneath the dresser, expressing his pain, for many, many hours. Leave, Webster’s Third New International Dictionary of the English Language Unabridged 1287 (1971)). In light of this second dictionary definition of “leave,” the Legislature could not have intended the statute to focus exclusively on the moment a parent or guardian initially departs from a child. The statute is also implicated where a parent or guardian knows that a child is in peril (even if in the next room) and intentionally leaves that child in peril. {34} Under the second dictionary definition of “leaving” that the Legislature intended in Section 30-6-1 (B), sufficient evidence supports the jury’s vei'dict. The jury heard testimony regarding the grave and abnormal extent of Isaiah’s injuries. As a result of being trapped underneath the dresser, Isaiah suffered compartment syndrome. The jury heard testimony from Dr. Dale Hoekstra, M.D., an orthopedic surgeon with University of New Mexico’s Children’s Hospital (UNMH) and medical director of Carrie Tingley Hospital in Albuquerque. Dr. Hoekstra testified that compartment syndrome “is a condition that arises as a result of an injury to an extremity, almost invariably between the knee and the ankle, in which the pressures in the leg build up to the point that the blood can no longer supply the muscles in the leg, and they start to die or necrose.” Elevated creatine kinase [“CK”] levels in Isaiah’s blood indicated that Isaiah suffered from compartment syndrome. Dr. Hoekstra testified that the normal range for CK is between 72 to 367 units, and at 9:57 a.m., shortly after his arrival, Isaiah’s CK level was 36,605 units, which indicated extensive trauma that threatened the loss of Isaiah’s legs and the failure of Isaiah’s kidneys. Because Isaiah urgently needed the care of a pediatric nephrologist, pediatric surgeons, and pediatric intensive care doctors, Isaiah was airlifted from Christus St. Vincent Hospital in SantaFe to UNMH in Albuquerque. Once Isaiah arrived at UNMH, his CK peaked at 123,000 units. At UNMH, Dr. Hoekstra performed an emergency fasciotomy on both of Isaiah’s legs and found extensive damage, including some tissue death, in Isaiah’s leg muscles. {35} The jury was also presented with evidence establishing that, in order for Isaiah to have developed such an extraordinarily high CK level, Isaiah had to have been trapped under the dresser for eight to twelve hours. Dr. Hoekstra opined that the extent of Isaiah’s injuries indicated that Isaiah had been pinned under the dresser for “at least twelve hours.” Dr. Denise Coleman, M.D., a pediatric critical care physician at UNMH, who observed Isaiah immediately before his surgery, conservatively estimated that Isaiah was pinned under the dresser for “a minimum of six to twelve hours.” {36} The jury also heard testimony from Stephenson’s expert witness, Dr. Steven Gabaeff, M.D., who is board certified in emergency medicine and operates a clinical forensic medical practice. Even Dr. Gabaeff testified that Isaiah’s CK levels were the highest he had ever seen and estimated that Isaiah’s “muscles had no oxygen for a very long time to get that condition.” Dr. Gabaeff estimated that Isaiah had been pinned under the dresser for four-and-a-half to eight hours, that “[i]t could have been a little longer even,” and that “[b]ased on the [CK levels] going so high, [he] tended to really believe that it was on the longer side.” Dr. Gabaeff further opined that “if something happen[ed], say, at 10:30 or 11:00 or 11:30, you know, we’re talking about eight hours, and that seems to me to be about what I’d expect... we already have numbers that, you know, lead us in a direction.” Therefore, from the expert testimony presented by the State and by Stephenson, the jury was permitted to find that Isaiah was underneath the dresser for eight to twelve hours. Consequently, the jury was permitted to infer that the dresser fell on Isaiah between 10:30 p.m. and 11:00 p.m. and remained on top of him until 7:00 a.m. the next morning. {37} Critically, the jury was presented with additional evidence from which it was permitted to infer the following two findings: First, Isaiah would have expressed audible and sustained indications of pain. Second, Stephenson was both home and awake throughout the night and into the morning, during the time that Isaiah was pinned and expressing pain. Dr. Coleman testified that Isaiah would have been able to scream and that “he would have been in pain for a very long time.” Dr. Coleman further testified that the impairment of blood flow in Isaiah’s legs would have caused him extreme pain and compared Isaiah’s pain to the pain of having an arterial blood clot. Dr. Coleman referenced her training in critical care in Seattle, where she cared for children who had been pinned under fallen trees during the course of lumbering accidents, and testified, “[I]t’s painful. Oftentimes, the pain never goes away. ... I can tell you it hurt until they could get I.V. pain meds.” {38} Apodaca, Isaiah’s father, testified that he worked that night from 6:00 p.m. until 1:25 a.m. or 1:30 a.m. and that he received text messages from Stephenson during the “whole time [he] was working” in which Stephenson invited Apodaca to come spend the night with her at her apartment. Apodaca went to Stephenson’s apartment after he left work and arrived at approximately 2:00 a.m. She was home. Upon Apodaca’s request, Stephenson went to McDonald’s to buy some food. Stephenson returned home at approximately 2:45 a.m. Apodaca asked Stephenson to check on Isaiah at about 3:00 a.m. Stephenson and Apodaca then ate, had sex, and went to sleep at approximately 4:00 a.m. or 4:15 a.m. {39} From this evidence, the jury was permitted to draw reasonable inferences to reach its verdict. The jury was permitted to rely on the medical expert testimony — and on its common sense and experience — to infer from the severity of Isaiah’s injuries, coupled with the shock and pain that a falling dresser would cause to a toddler, that Isaiah cried and screamed loudly, for a prolonged duration. The jury was permitted to infer — based on the estimations of Doctors Hoekstra, Coleman, and Gabaeff — that during the entire time from Apodaca’s arrival to the time of their going to sleep, Isaiah was pinned underneath a dresser, enduring and expressing his pain. Based on those same estimations, the jury was entirely free to reject Stephenson’s affidavit testimony that she checked on Isaiah at 2:00 a.m., and that he was fine. The jury was rather permitted to infer that, given the severity of Isaiah’s injuries and the copious medical expert testimony as to the cause of those injuries, at 2:00 a.m. Isaiah was pinned under the dresser. The jury was also permitted to rely on its common sense to infer that the type of crying and screaming that Isaiah expressed as the dresser fell upon him and as his muscle tissue was dying was abnormal — different in both kind and duration from the type of crying that a follower of Dr. Ferber’s method ofparenting may recognize as normal. And the jury was permitted to find that if Isaiah had expressed his pain, Stephenson would have heard it. Detective Van Etten testified that Stephenson’s apartment was small, such that “anybody would be able to hear anybody from one end of the apartment to the other.” In sum, the jury was permitted to find that Stephenson intentionally left Isaiah under circumstances whereby he suffered neglect. {40} The majority worries that a decision which upholds the jury’s verdict “could potentially criminalize parents’ actions every single time they tuck their children into bed and harm befalls their children at night through some unfortunate accident.” Maj. Op., ¶ 28. While I understand this concern, I do not share it. Two bulwarks prevent a decision upholding the jury’s verdict from threatening well-meaning parents with criminal liability. First, to establish a violation of Section 30-6-l(B), the State must prove that the child is exposed to neglect, which is specifically defined by Section 30-6-1(A)(2), and which clearly excludes criminal liability for accidental injuries that befall children unbeknownst to well-meaning parents. Second, and more fundamentally, it is the hard and jagged facts of cases which prevent legal conclusions from tumbling down the slippery slope. For example, in this case, the jury had much more to consider than just the scenario of a parent putting a child down to sleep for the night, only to wake up in the morning to discover that the child had experienced some injury as a result of an accident unbeknownst to the parent. Here, the jury was permitted to infer that Stephenson knew Isaiah was suffering an abnormal degree of pain but, nevertheless, intentionally left him in that condition. Drawing every reasonable inference in favor of the verdict, as we are required to do, the jury had sufficient evidence to make that finding. {41} Accordingly, I respectfully dissent. JUDITH K. NAKAMURA, Justice I CONCUR: PETRA JIMENEZ MAES, Justice