IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: August 7, 2014

Docket No. 33,296

STATE OF NEW MEXICO,

 Plaintiff-Respondent,

v.

JULIAN GUTIERREZ,

 Defendant-Petitioner.

ORIGINAL PROCEEDING ON CERTIORARI
Drew D. Tatum, District Judge

Daniel R. Lindsey, P.C.
Daniel R. Lindsey
John L. Collins, Jr.
Clovis, NM

for Petitioner

Gary K. King, Attorney General
Martha Anne Kelly, Assistant Attorney General
Santa Fe, NM

for Respondent

OPINION

DANIELS, Justice.

{1} This case involves factually related issues of the boundaries between proper and improper prosecutorial conduct in dealing with recalcitrant witnesses and of the circumstances in which a mistrial and retrial may take place without violating constitutional double jeopardy protections when a witness does not appear for trial. Following federal double jeopardy principles in United States Supreme Court precedent, we conclude that a prosecution witness's failure to appear for Defendant's trial did not constitute manifest

1

necessity for granting a mistrial after a jury had been selected and sworn to hear his case. Because empaneling a new jury and retrying Defendant would violate his double jeopardy protections under the United States Constitution, we remand to the district court with instructions to dismiss. Because of our holding, we do not decide any issues relating to the scope of the Double Jeopardy Clause of the New Mexico Constitution or whether the prosecution team inappropriately threatened the witness.

## I.    BACKGROUND

**{2}**    A Curry County grand jury indicted Defendant Julian Gutierrez on three counts of criminal sexual contact of a minor, contrary to NMSA 1978, Section 30-9-13(B)(2)(a) (2003), based on the testimony of Defendant's daughter that he touched or pinched her breasts on several occasions when she was fifteen years old. At the time of the alleged incidents, Defendant was estranged from his daughter's mother, who lived in Lubbock, Texas. After Defendant's indictment, his daughter moved out of their home to stay next door with her paternal grandparents.

**{3}**    On Monday morning, February 23, 2009, the first scheduled day of trial, Defendant informed his attorney that he had been provided with a statement written by his daughter that related to a recent visit by prosecution representatives to her school. In its entirety, the statement said,

> The da was telling me that if I didnt go to the court they could take my son away. and she was try to say that my dad touched me 6 time and I had told her that I told the oaisis people that he just did it 3 time and that we were just playing. and she said that 6 times is closer to 3 time and she told my principle and counsler that if it was OK for them to pick me up tuesday morning at 8:30 and I told them that they have to ask my parents first and she told me that they dont. and she had also made me put my phone on the desk. She would not allow anyone in the room with us. They were telling me that my grandparents house wasnt a good place for me to be staying. Was telling me that I could get charges on me if I change my story. and that I have someone to think about now that I have to make a good choice of what I want.
> February 20, 2009
> /s/ Naomi Gutierrez

When defense counsel asked for a hearing on the new revelations, the prosecutor admitted not having disclosed to the defense anything about the pretrial encounter at which the daughter attempted to recant her grand jury testimony. After initially taking the position that she did not have to do so, the prosecutor ultimately agreed to provide the defense with an audio recording of the incident. The district court refused a defense request to conduct an immediate hearing on the matter, proceeded to select and swear a jury to hear the case, and recessed for the day, with testimony to begin the next day, Tuesday, February 24.

2

**{4}** The next morning, when Defendant's daughter did not appear to testify and the State could not locate her, the State asked the district court to make a finding of manifest necessity and declare a mistrial. Defendant objected to granting a mistrial and moved instead to dismiss with prejudice on the ground that the State's officers committed prosecutorial misconduct in inappropriately threatening the daughter during their private encounter at the school. Without ruling on the motions or proceeding further with the trial, the court issued a bench warrant for the daughter's arrest for failure to appear for trial and, despite the defense's argument that it was ready to go forward that day, temporarily released the jury.

**{5}** At a brief hearing two weeks later, the daughter still not having been located, the district court declared a mistrial over the objection of the defense and permanently discharged the jury. The court rejected Defendant's argument that determining manifest necessity required considering the "intertwined" matter of prosecutorial misconduct in the encounter with the daughter, saying that it would address the propriety of that encounter separately "at a later date." The court made no findings that Defendant contributed in any way to the daughter's nonappearance for trial or that the prosecution was unaware its witness might not appear for trial when the jury was sworn, finding simply that there had been "a jury fully empaneled and sworn and the victim having been served a subpoena then failed to appear" and concluding that there was "manifest necessity for retrial."

**{6}** After the daughter had been arrested on the bench warrant two weeks later, the court held hearings on Defendant's motions to dismiss for prosecutorial misconduct and to preclude retrial for lack of manifest necessity justifying the mistrial. Evidence presented at the hearings included an audio recording of the school encounter three days before trial, the live testimony of the daughter, and the live testimony of the police detective who had participated with the prosecutor and the district attorney's victim advocate in questioning the daughter at her school.

**{7}** The daughter, who appeared with her separate attorney, testified that a few days before the scheduled trial the State's officials had her removed from class and taken to "the officer's room . . . inside the main office" where the door was locked and her cell phone was removed from her immediate possession. Her testimony focused on threats by the State's officers to file perjury charges against her and take away her young son after she told the prosecutor that her mother had influenced her to make false charges against her father. She testified that the threats scared her and caused her not to show up for the jury trial several days later. After the school encounter, she wrote and delivered to her own lawyer the letter that was delivered to defense counsel the morning of jury selection.

**{8}** The detective admitted participating in the confrontation at the school at the request of the lead prosecutor and admitted that the State's representatives raised questions about what might happen to the daughter's baby but denied that anything they said constituted a threat. His testimony emphasized that the State's officers were trying to get the daughter to tell the truth. Neither the prosecutor nor the district attorney's victim advocate, the other two participants in the school questioning, testified.

**{9}** Although the State had alleged in its brief requesting a mistrial that Defendant had been in some way responsible for the nonappearance of his daughter, the record contains no substantial evidence supporting the allegation. The daughter testified that her father had nothing to do with her not showing up for court and that the only reason she did not appear was because the prosecutor threatened to take her son away. In addition, a filed affidavit by a boyfriend of the daughter represented that it was his idea alone to take her to Texas after she told him tearfully "that she wanted to leave" because the prosecution had threatened "to take her child away" and "charge her with perjury if she did not testify the way they wanted."

**{10}** The most objective and complete evidence of the school encounter introduced at the hearing was the verbatim audio recording created by the State's officers. It contained corroboration for parts of what had been described in the testimony, both the friendly admonitions to tell the truth and the warnings that the daughter could be prosecuted for perjury and that her two-year-old son could be taken from her if she did not appear at trial and testify consistently with her previous grand jury testimony.

**{11}** The audio recording begins with the prosecutor advising the daughter that "the reason we came here is because you didn't show up for our meeting" and confirming that the daughter had received her subpoena and continues with the district attorney's victim advocate reminding the daughter of her previous warnings that she "had to show up" in court if she received a subpoena. After the prosecutor said she wanted to go over the expected testimony, the daughter attempted to recant her prior allegations, saying that she had fabricated her grand jury testimony because her mother had influenced her to do so.

| | |
|---|---|
| Daughter: | Actually, my mom's the one that told me to tell ya'll that. |
| Prosecutor: | That you were going to get into trouble? |
| Daughter: | No. That, to tell ya'll what happened. |
| Prosecutor: | Did your mom tell you to tell the truth? |
| Daughter: | Mmm, no. She just said tell them *that*. She didn't say to tell them the truth. |
| Prosecutor: | Okay what is the truth? |
| Daughter: | That he didn't do nothing. |
| Prosecutor: | What do you mean he didn't do nothing? |
| Daughter: | He didn't touch me or nothing. |
| Prosecutor: | Okay. You gave your statement under oath at the grand jury that [Defendant] did touch you. |
| Daughter: | I know, because my mom had told me to. |
| | . . . . |
| Prosecutor: | So when you talked to Mr. Baskett at The Oasis [Children's Advocacy Center], were you lying? |
| Daughter: | M-hm, because my mom had told me. It's on the messages that the detective has. |
| | . . . . |

4

| | |
|---|---|
| Prosecutor: | So what is the truth? |
| Daughter: | That he didn't do nothing. |
| Prosecutor: | Okay. Why did you say that he did? |
| Daughter: | Because I wanted to go live with my mom, but now I don't. |

**{12}** After expressing their concerns that family members may have been pressuring her to change her story and testify falsely, the prosecutor and the investigator then had the following exchange with the daughter:

| | |
|---|---|
| Prosecutor: | Remember, I talked to you and you swore, and if you say that it didn't happen in court this week, |
| Daughter: | um-hmm, |
| Prosecutor: | then we can charge you with perjury for lying before. Do you realize that? Is that what you want to do? Do you want to be faced with charges? |
| Daughter: | No. |
| | . . . . |
| Investigator: | And what you need to be, what you need to be concerned with is you don't, you need to be concerned with yourself, and, and I guess you have a baby. Is that correct? |
| Daughter: | Um-hmm. |

**{13}** The investigator and the victim advocate continued:

| | |
|---|---|
| Advocate: | So you're willing to get in trouble. |
| Investigator: | Why would you do that? If you get into trouble where's your baby gonna go? |
| Daughter: | Um, I don't |
| | . . . . |
| Investigator: | So, you're saying you're willing to get in trouble? |
| Daughter: | Um-hmm. |
| Investigator: | If you get into trouble, then your child is going where? |
| Daughter: | To a home. |
| Investigator: | Is that what you want? |
| Daughter: | No. |
| Investigator: | But you're not willing to do anything about it. Is that what you're saying? |

**{14}** Following these exchanges, the daughter yielded and partially recanted her recantation, telling the State's officers, "he did touch me, but we were playing." During the exchange, the advocate cautioned, "you just don't change your story, hon." Before ending the encounter, the State's investigator warned the daughter of the likely outcomes for her two-year-old son if she failed to testify appropriately:

5

| Investigator: | And, and if you don't do what's right or you, you don't get up there and say what you told [the prosecutor] just now, . . . you're putting your son in a situation that, number one, he has absolutely no control over. |
| Daughter: | I know. |
| Investigator: | Number two, that he's ultimately . . . , well, I can tell you at two years old, you think if some, some stranger comes and picks him up, |
| Daughter: | um-hmm, |
| Investigator: | he's not gonna like that. |
| Daughter: | Yeah. |
| Investigator: | Okay. But that's not just gonna stop right there. Just, you don't like it. Don't let it happen to your son. Okay? |

**{15}** After the prosecution team told the daughter they would help her and would be there with her at court, the prosecutor told her they would pick her up at school and take her to trial to testify the following Tuesday morning.

**{16}** The district court ultimately denied Defendant's motions to dismiss for prosecutorial misconduct in the school encounter and reaffirmed without further findings its earlier manifest necessity mistrial ruling, but vacated the scheduled retrial to permit Defendant to appeal.

**{17}** The Court of Appeals affirmed the district court, holding both that the conduct of the State's officers did not constitute prosecutorial misconduct and that Defendant's federal and state constitutional protections against double jeopardy were not violated because manifest necessity justified a mistrial when Defendant's daughter failed to appear as a witness after the first jury was sworn. *See State v. Gutierrez*, 2012-NMCA-013, ¶¶ 23, 36, 269 P.3d 905. We granted certiorari to review those rulings. *See State v. Gutierrez*, 2012-NMCERT-001.

## II.   DISCUSSION

### A.   Double Jeopardy

**{18}** Both the United States Constitution and the New Mexico Constitution guarantee that a state may not compel a person to be "twice put in jeopardy" for the same criminal offense. U.S. Const. amend. V; N.M. Const. art. II, § 15; *see Benton v. Maryland*, 395 U.S. 784, 787, 794, (1969) (holding that the Fourteenth Amendment secures to defendants in state prosecutions the protections of the Double Jeopardy Clause of the Fifth Amendment, overruling *Palko v. Connecticut*, 302 U.S. 319 (1937)). Because Defendant has invoked the protections of both constitutions, we apply our interstitial analysis and consider first whether the federal claim is dispositive before conducting a state constitutional analysis. *See State v. Lopez*, 2013-NMSC-047, ¶ 8, 314 P.3d 236 (noting that where an asserted right is protected by the federal constitution, there is no need to reach the counterpart state

6

constitutional claim).

**{19}** The Double Jeopardy Clause of the United States Constitution not only guarantees that

> the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty,

but also protects "the defendant's valued right to have his trial completed by a particular tribunal." *Cnty. of Los Alamos v. Tapia*, 1990-NMSC-038, ¶ 16, 109 N.M. 736, 790 P.2d 1017 (internal quotation marks and citations omitted), *overruled on other grounds by City of Santa Fe v. Marquez*, 2012-NMSC-031, ¶ 25, 285 P.3d 637. "Consequently, as a general rule, the prosecutor is entitled to one, and only one, opportunity to require an accused to stand trial." *Arizona v. Washington*, 434 U.S. 497, 505 (1978).

**{20}** There is no question in this case that jeopardy attached at the moment the district judge swore the jury. Just a few weeks ago, the United States Supreme Court again reaffirmed what it has "consistently treated as a bright-line rule: A jury trial begins, and jeopardy attaches, when the jury is sworn," whether or not a single witness is ever called to testify. *Martinez v. Illinois*, __ U.S. __, __, 134 S. Ct. 2070, 2075-77 (2014) (per curiam) (holding that the Double Jeopardy Clause precluded retrial of a defendant after the first jury was sworn, even though no evidence was presented as a result of the prosecution's inability to procure attendance of its key witnesses).

**{21}** The only double jeopardy issue in serious contention in this case is whether the district court correctly determined that there was "manifest necessity" for discontinuing the first trial and discharging the jury that had been sworn to try the case because of the nonappearance of an important prosecution witness. While manifest necessity mistrial rulings are reviewed for abuse of discretion, *see Callaway v. State*, 1990-NMSC-010, ¶¶ 8-10, 109 N.M. 416, 785 P.2d 1035 (reversing conviction after retrial and remanding for release of the defendant for failure of the district court judge to "exercise a sound discretion" in determining manifest necessity for declaring a mistrial), the United States Supreme Court has made it clear that "the strictest scrutiny is appropriate when the basis for the mistrial is the unavailability of critical prosecution evidence." *Arizona v. Washington*, 434 U.S. at 508, 515-16 (holding that an effective finding of manifest necessity was an exercise of "sound discretion" where defense misconduct in raising inadmissible and prejudicial matters before the jury created "the 'high degree' of necessity" for the mistrial); *see also United States v. Fisher*, 624 F.3d 713, 720, 723 (5th Cir. 2010) ("hold[ing] that there was no manifest necessity," concluding that federal law does not apply a deferential standard of review "in an unavailable-government-witness case," and noting that all of the other eight federal circuits deciding the issue have applied the *Arizona v. Washington* "strictest scrutiny"

7

standard).

**{22}** The manifest necessity standard has been a part of double jeopardy jurisprudence for most of our nation's history. *See United States v. Perez*, 22 U.S. (9 Wheat) 579, 580 (1824) (requiring courts "to exercise a sound discretion" in determining manifest necessity "to discharge a jury from giving any verdict" and initiate a new trial). "The classic example [of the need for a second trial] is a mistrial because the jury is unable to agree." *Downum v. United States*, 372 U.S. 734, 736 (1963) (citing *Perez*). When the situation involves a deadlocked jury, "the trial judge should be allowed broad discretion whether to declare a mistrial," but "when the basis for the mistrial is the unavailability of key prosecution evidence or when there is reason to believe that the prosecutor is attempting to harass or gain a tactical advantage over the defendant, the strictest scrutiny is necessary." *State v. Saavedra*, 1988-NMSC-100, ¶¶ 9, 16, 108 N.M. 38, 766 P.2d 298 (emphasizing that a "prosecutor must shoulder a heavy burden to justify the mistrial if the double jeopardy bar is to be avoided" but not reversing the district court's finding of manifest necessity where defense counsel was stricken with illness during trial and where the evidence supported the trial court's findings that neither a rescheduling with the existing jury nor other alternatives to a mistrial were feasible).

**{23}** The United States Supreme Court has not been hospitable to claims of manifest necessity resulting from missing prosecution witnesses. In *Downum*, the Court held that there was no manifest necessity justifying a mistrial immediately after a jury was sworn when the prosecution discovered that a key witness was not present to testify, concluding that where the prosecutor "impaneled the jury without first ascertaining whether or not his witnesses were present, he took a chance" and could not avoid the consequences of his gamble that the witness would appear. *See* 372 U.S. at 737 (internal quotation marks and citation omitted). The Court therefore held that the Double Jeopardy Clause barred a retrial. *See id.* at 737-38.

**{24}** In this case, our Court of Appeals distinguished *Downum* and held that in the absence of evidence that the prosecution knew its key witness would be unavailable to testify, manifest necessity would justify a mistrial when the witness did not appear. *See Gutierrez*, 2012-NMCA-013, ¶¶ 14, 18. The opinion below did not address the language in *Downum* indicating that its principle would apply even where the prosecution discovered "immediately after the jury was impaneled" that its "evidence was insufficient." *See Downum*, 372 U.S. at 737-38. *Downum* left some room for doubt as to its holding, however, by also explicitly refusing "to say that the absence of witnesses 'can never justify discontinuance of a trial.'" *Id.* at 736-37 (quoting with approval *Wade v. Hunter*, 336 U.S. 684, 685, 687-88 (1949), in which a court martial had to be stopped and begun anew during the Third Army's rapid advancement across German territory in World War II because "the tactical problems of an army in the field were held to justify the withdrawal of a court-martial proceeding and the commencement of another one on a later day").

**{25}** Whatever ambiguities may have been created by *Downum* have now been

substantially lessened by the United States Supreme Court's recent unanimous opinion in *Martinez*, handed down after the Court of Appeals opinion was filed in this case. *Martinez* was an aggravated battery and mob action prosecution in which the state had gone to great lengths to secure attendance of two reluctant key witnesses, placing both under subpoena and having them come before the court to be ordered to appear for trial. *See* 134 S. Ct. at 2072. On the morning of the final rescheduled trial and before jury selection, the state moved for a continuance because the witnesses once again had failed to appear. *See id.* After giving the state some time to locate its witnesses while jury selection and other matters were addressed, the trial court denied another continuance and announced it was going to swear the selected jury and begin the trial unless the state chose instead to voluntarily dismiss its case before jeopardy attached. *See id.* Instead of dismissing and avoiding having the jury sworn, the state advised the court that it would "not be participating in the trial." *See id.* at 2073. After the jury was sworn and the State declined to make an opening statement or introduce evidence, the court granted a directed verdict and ordered the charges dismissed. *See id.*

**{26}**    The Illinois Supreme Court reversed, holding that the trial court erred in denying the requested continuance and that because the defendant had never truly been placed in jeopardy where the State refused to proceed before the sworn jury, the Double Jeopardy Clause did not protect him against continued prosecution. *See id.* at 2073-74.

**{27}**    The United States Supreme Court reversed the Illinois Supreme Court, applying its bright-line test in holding that jeopardy attached at the moment the jury was sworn, whether or not the prosecution ever called a witness or participated in any other way in the trial. *See id.* at 2074-75. Although the Court expressly based its holding in part on the fact that the trial court's actions, however named, constituted an acquittal under controlling precedents, *id.* at 2076, it followed with several pointed observations that are instructive in interpreting both *Martinez* and *Downum*. First, it rejected unrestricted judicial discretion that would allow routine witness unavailability to bar protection from retrial:

> Indeed, even if the trial court had chosen to dismiss the case or declare a mistrial rather than granting Martinez's motion for a directed verdict, the Double Jeopardy Clause probably would still bar his retrial. We confronted precisely this scenario in *Downum v. United States*, 372 U.S. 734 . . . (1963), holding that once jeopardy has attached, the absence of witnesses generally does not constitute the kind of "'extraordinary and striking circumstanc[e]'" in which a trial court may exercise "discretion to discharge the jury before it has reached a verdict." *Id.*, at 736 . . . ; see also *Arizona v. Washington*, 434 U.S. 497, 508, n.24 . . . (1978).

*Martinez*, 134 S. Ct. at 2076 n.4 (alteration in original).

**{28}**    In addition, in terms equally applicable to the case before us, the Court emphasized that its view of the binding constitutional effect of swearing a jury for the trial of an accused need not result in "unfairness to prosecutors or to the public." *See id.* at 2076. The Court

acknowledged lawful alternatives for prosecutors to avoid the strictures of the Double Jeopardy Clause when they may find themselves without necessary witnesses, such as (1) seeking continuances, (2) requesting that jury swearing be postponed until the appearance of needed witnesses can be assured, and (3) as a last resort, voluntarily dismissing the case before the trial judge swears the jury. *See id.* at 2076-77. But when "the State declined to dismiss its case, it took a chance[,] . . . enter[ing] upon the trial of the case without sufficient evidence to convict." *Id.* at 2077 (alterations and omission in original) (internal quotation marks omitted) (quoting *Downum*, 372 U.S. at 737).

{29}    If there is any reason to doubt that essential witnesses might not appear for trial, prosecutors should ensure their presence before the jury is sworn. In this case, there was substantial reason to question whether the daughter would appear. She had already failed to appear at a scheduled pretrial interview at the district attorney's office, resulting in a prosecution team making a surprise visit to her school, having her pulled out of class and cautioning her about her obligation to appear in response to the subpoena. She had attempted to recant her accusations against her father. The prosecution team expressed concern several times in the private encounter about arrangements for the daughter to appear for trial, telling her they would personally transport her to court. And even before jury selection began, the prosecution learned of the daughter's handwritten declaration, which began with "The da was telling me that if I didnt go to the court they could take my son away." A simple request that the judge not swear the jury until the key witness appeared at the courthouse, especially where the prosecution had chosen to subpoena the witness to come to court the day after jury selection, would have avoided the attachment of constitutional jeopardy. Instead, the prosecution took a calculated risk and "proceeded to trial in the face of a known risk that [the witness] would be unavailable at trial." *Walck v. Edmondson*, 472 F.3d 1227, 1231, 1239 (10th Cir. 2007) (prohibiting a retrial after the trial judge granted a mistrial when an important government witness went into labor two weeks early).

{30}    Trial judges also should be mindful of the constitutional consequences of swearing the jury and should consider delaying that significant step if there is a question whether the trial will be able to continue to completion. In this case, once the court realized there were issues to address regarding a recalcitrant witness, it could have released the selected jurors with appropriate admonitions and instructions to return the next morning to be sworn and begin hearing the case and then could have released the unsworn prospective jurors without double jeopardy consequences when the witness did not appear as scheduled. Once the jury has been sworn and jeopardy has attached, declaration of a mistrial should be avoided, particularly in the case of a missing witness. Postponing the permanent discharge of the jury until the daughter was located just two weeks later would have at least avoided the serious double jeopardy problem that the declaration of mistrial created in this case.

{31}    In this case, Defendant never consented to a mistrial, vigorously opposing it at every opportunity. And because the district court did not find that Defendant procured the nonattendance of the witness, we do not address whether such a hypothetical scenario could justify a mistrial and retrial where the first sworn jury is discharged over the objection of a

defendant. This case boils down to a straightforward missing prosecution witness case without a district court finding of extraordinary circumstances. Applying the federal strictest scrutiny test and the guidance of the United States Supreme Court in *Downum* and *Martinez*, we conclude that the district court abused its discretion in declaring a mistrial under the circumstances of this case and that the federal Double Jeopardy Clause therefore precludes further prosecution of Defendant. Because of that dispositional holding, we need not consider whether the Double Jeopardy Clause of the New Mexico Constitution would provide even greater protection than its federal counterpart. *See State v. Ketelson*, 2011-NMSC-023, ¶ 10, 150 N.M. 137, 257 P.3d 957 (allowing consideration of the possible broader protections of the New Mexico Constitution where the United States Constitution does not protect the right that Defendant claims).

## B.    Prosecutorial Misconduct

**{32}**    We also need not decide whether Defendant is correct that the prosecution team's conduct at the daughter's school constituted bad faith misconduct requiring dismissal, and we therefore make no determination that the prosecution team acted out of bad motives or with intent to have the witness testify falsely. *Cf. State ex rel. Brandenburg v. Blackmer*, 2005-NMSC-008, ¶ 2, 137 N.M. 258, 110 P.3d 66 (holding that "a victim advocate employed by a district attorney's office is part of the prosecution team"); *State v. Wisniewski*, 1985-NMSC-079, ¶ 21, 103 N.M. 430, 708 P.2d 1031 (noting that police officers involved in a case are part of the prosecution team). But we caution that lawyers or the agents of lawyers representing any party must avoid intimidating prospective witnesses or pressuring them to testify in a particular way, regardless of a lawyer's personal belief about what is true and what is not. The State is correct in its position that simply advising a witness about the realities of the perjury statutes is not sanctionable misconduct. *See State v. Baca*, 1997-NMSC-045, ¶¶ 35-36, 124 N.M. 55, 946 P.2d 1066 (holding that where there is "nothing threatening or coercive" about the communication, "[i]t is not improper to merely advise a witness that he could face prosecution for perjury"), *overruled on other grounds by State v. Belanger*, 2009-NMSC-025, ¶¶ 35-36, 146 N.M. 357, 210 P.3d 783. However, anything beyond a simple and neutral advisement, even when conducted by a judicial officer, can cross permissible boundaries. *See, e.g.*, *Webb v. Texas*, 409 U.S. 95, 97-98 (1972) (holding that a trial judge's warnings to a defense witness about the dangers of perjury infringed on the defendant's due process rights where the judge not only provided information of the consequences of perjury but also implied that the judge believed the witness would lie and assured the witness that if he lied he would be prosecuted for perjury and probably convicted); *United States v. Jackson*, 935 F.2d 832, 847 (7th Cir. 1991) (explaining that, while no constitutional violation occurs where a prosecutor simply provides "an unrepresented defense witness" with a truthful warning, there is a strong inference of impropriety where "the substance of what the prosecutor communicates to the witness is a threat over and above what . . . [is] timely, necessary, and appropriate" (internal quotation marks and citation omitted)); *United States v. Morrison*, 535 F.2d 223, 227-28 (3d Cir. 1976) (noting that the actions of a prosecutor who repeatedly warned a prospective defense witness about the possibility of perjury charges and conducted "a highly intimidating personal

interview" of the witness were completely unnecessary and violated the defendant's constitutional right to have the witness give evidence in the defendant's favor). We have found no precedent in this state or elsewhere that condones going beyond merely advising a witness of direct perjury consequences to raise the specter of collateral consequences, such as losing custody of one's own child.

**{33}** In addition to the reported cases disapproving the intimidation of defense witnesses by inappropriate threats, similar principles apply to attempts to shape the testimony of a party's own witness. The federal court in *United States v. Juan*, 704 F.3d 1137, 1140 (9th Cir. 2013), dealt with a situation in which the alleged victim, called to testify by the prosecution in a domestic violence case, attempted to recant previous accusations against her husband and then recanted her recantation after prosecutors raised the prospect of perjury charges with the wife's attorney. Although the court held that the defendant did not prove that any allegedly improper prosecution threats were relayed to the witness by her attorney, it pointedly cautioned,

> We have often stressed the imperative that prosecutors and other officials maintain a posture of strict neutrality when advising witnesses of their duties and rights. Violating this duty by bullying a prosecution witness away from testimony that could undermine the government's case is no less distortive of the judicial fact-finding process than improperly meddling with the testimony of a defense witness. Regardless of whose witness is interfered with, the constitutional harm to the defendant is the same—the inability to mount a fair and complete defense. We see no reason to doubt that the government's substantial interference with the testimony of its own witnesses can violate the Due Process Clause.

*See Juan*, 704 F.3d at 1141-42 (internal quotation marks and citation omitted); *see also United States v. Scheer*, 168 F.3d 445, 458 (11th Cir. 1999) (reversing a conviction as a result of the prosecution's private intimidation of its own witness).

**{34}** Like the court in *Juan*, although we make no determination of misconduct we caution prosecutors—and defense counsel as well—to avoid attempts to pressure witnesses into changing their testimony, no matter what subjective good faith may arguably motivate their efforts. Addressing perceived falsity in a more aggressive manner should take place in open court and not in private encounters beyond the perception of the court and opposing counsel.

## III.   CONCLUSION

**{35}** Under the Double Jeopardy Clause of the United States Constitution, there was no manifest necessity for releasing the sworn jury in this case and subjecting Defendant to a second trial. We reverse the contrary decisions of the courts below and remand with instructions to dismiss Defendant's indictment.

**{36}  IT IS SO ORDERED.**

_____

**CHARLES W. DANIELS, Justice**

**WE CONCUR:**

_____

**BARBARA J. VIGIL, Chief Justice**

_____

**PETRA JIMENEZ MAES, Justice**

_____

**RICHARD C. BOSSON, Justice**

_____

**EDWARD L. CHÁVEZ, Justice**