# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**Opinion Number:** _____

**Filing Date: November 18, 2014**

**NO. 31,273**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**JENNIFER STEPHENSON,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
**Michael E. Vigil, District Judge**

Gary K. King, Attorney General
Margaret E. McLean, Assistant Attorney General
Joel Jacobsen, Assistant Attorney General
Santa Fe, NM

for Appellee

Law Offices of the Public Defender
Jorge A. Alvarado, Chief Public Defender
B. Douglas Wood III, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**OPINION**

**GARCIA, Judge.**

{1}    A jury found Jennifer Stephenson (Defendant) guilty of criminal child abandonment pursuant to NMSA 1978, Section 30-6-1(B)(2009). Defendant alleges multiple errors on appeal, including a contention that there was insufficient evidence to support the verdict.  Specifically, she argues that her conduct in putting her two-year-old son (Child) to bed in his bedroom and ignoring his cries during the night does not constitute "leaving" or "abandoning" Child under Section 30-6-1(B). We agree and reverse Defendant's conviction. Because we reverse Defendant's conviction, we need not address the remaining issues raised on appeal.

**BACKGROUND**

{2}    On the evening in question, Defendant put her Child to bed in his bedroom and locked the bedroom door. Defendant eventually went to sleep in her own bedroom in the same apartment. Sometime during the night, Child climbed from his toddler bed up onto a dresser that was standing next to his bed. The 112-pound dresser tipped over and fell onto Child, pinning his legs between the toddler bed railing and the dresser.

{3}    Defendant told a detective that she did not hear any cries coming from Child's bedroom. And Child's father, who returned to the apartment from work at 2:00 a.m.

that night, also said that he did not hear any cries that night. At about 7:00 a.m., the father woke and heard "whimpering" from Child's bedroom. He unlocked Child's bedroom door with a "butter knife" and discovered that Child was pinned between the dresser and the bed railing. He removed the dresser from Child and brought him to Defendant.

{4} Defendant, still in her pajamas, left to take Child to the hospital emergency room. On the way to the hospital, Defendant stopped at her parent's apartment to pick up her father. Defendant checked in to the emergency room by 7:58 a.m. Defendant told the emergency room doctor that a dresser had fallen on Child.

{5} The emergency room doctor testified that Child's injuries were not consistent with being "hit" by a dresser. He said that instead of bruises, there were pressure sores on both sides of Child's legs. Child had also developed "compartment syndrome," a condition in which the cells of the leg muscles begin to die from "pressure [to the legs] over time." The doctor confirmed that he initially thought that the pressure sores and the compartment syndrome may have been caused by Child being bound by a "belt" or a "strap." Because the nature of Child's injuries did not fit with the cause of the injury reported by Defendant, the doctor suspected child abuse and called the police. The State charged Defendant with negligent child abuse under Section 30-6-1(D). However, after further investigation, the doctors changed

2

their conclusion regarding the cause of Child's injury. At trial, the emergency room doctor testified that his "ultimate diagnosis" was that Child had sustained "a crush injury" that was "consistent with a very large piece of furniture pinning a child down over a period of hours." Additionally, the detective assigned to the case came to "believe [that] the dresser did, in fact, fall on [Child]" and that Child "was left there."

{6} All of the doctors who testified at trial said that Child, in order to develop pressure sores and compartment syndrome, would have been trapped between the dresser and the bed railing for hours. The emergency room doctor testified that it would take "several" hours for Child's injuries to form. The orthopedic surgeon who treated Child testified that he thought Child was trapped for at least "eight to twelve hours" and that "this type of injury usually takes [twelve] to [twenty-four] hours to develop." The pediatric intensive care doctor who treated Child testified that she thought Child was trapped for "a minimum of six to twelve hours." All of these doctors agreed that Child would have been in extreme pain and that he would have been "crying" and "screaming." And a pediatric psychologist testified that a child's cry from being "hurt" is different than his cry from being "tired" or "uncomfortable" and that "every mommy knows that."

{7} During its closing argument, the State told the jury that this case was about whether it is "okay to leave your child confined or pinned or trapped for [six] to

3

[twelve] hours." It told the jury that its "theory of the case" was that Child "didn't like going to bed"; that Defendant "put[] him in [his bed]room" and "locked the door"; that Child "climb[ed] up on th[e] dresser . . . and the chest f[ell]"; that Child was "in pain" and "crying"; and that "[Defendant] chose to ignore him." It said that "the crux of this case" was Defendant's "failure to act. . . . her nonaction. . . . it's about negligence."

{8}     The district court instructed the jury on the elements of the crime of negligent child abuse under Section 30-6-1(D)(1). And at defense counsel's request, the district court also instructed the jury on the elements of the crime of child abandonment. The jury acquitted Defendant of negligent child abuse, but it convicted her of child abandonment. On appeal, Defendant argues, among other things, that the evidence was insufficient to support the child abandonment conviction.

**DISCUSSION**

{9}     Our Supreme Court has observed that the Legislature "[r]ecogniz[ed] the wide variety of ways that a child can be harmed by abuse and neglect" and has adopted a "spectrum" of civil and criminal remedies to address child abuse. *See State v. Chavez*, 2009-NMSC-035, ¶ 12, 146 N.M. 434, 211 P.3d 891. On the "benign" end of this spectrum, the Legislature can "ensur[e] that children receive nutritious meals[.]" *Id.* More "intrusive[ly]," children may be placed in foster care or parental rights may be

4

terminated all together. *Id.* And "[o]n the far end of this spectrum lies the sanction for criminal child abuse, . . . punishable by . . . imprisonment" and potential loss of parental rights. *Id.* The statutory construction of various statutes within this spectrum of the criminal child abuse array is the first issue we must address in this case.

**Standard of Review**

{10}     Interpretation of a criminal statute is a question of law that we review de novo. *Id.* ¶ 10. Our "principal command" in construing a statute is to "effectuate the intent of the [L]egislature" by "using the plain language of the statute." *State v. Ogden*, 1994-NMSC-029, ¶ 24, 118 N.M. 234, 880 P.2d 845. When interpreting "the plain meaning of the words at issue," the appellate courts "often us[e] the dictionary for guidance." *State v. Boyse*, 2013-NMSC-024, ¶ 9, 303 P.3d 830.

{11}     We must "strictly" construe statutes that define criminal conduct. *Chavez*, 2009-NMSC-035, ¶ 10. And we will not read a criminal statute as applying to particular conduct "unless the legislative proscription is plain." *State v. Bybee*, 1989-NMCA-071, ¶ 12, 109 N.M. 44, 781 P.2d 316 (citing *United States v. Scharton*, 285 U.S. 518 (1932)).

{12}     Once an appellate court interprets the language set forth in the relevant statutes, it "appl[ies] a substantial evidence standard to review the sufficiency of the evidence at trial." *Chavez*, 2009-NMSC-035, ¶ 11.  We must review the evidence "in the light

most favorable to the prosecution" to determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (internal quotation marks and citation omitted). In doing so, we "indulg[e] all reasonable inferences and resolv[e] all conflicts in the evidence in favor of the verdict." *Id.* (internal quotation marks and citation omitted). We are not permitted to "weigh the evidence or substitute [our] judgment for that of the fact finder"; we determine only whether "there is sufficient evidence to support the verdict." *Id.* (internal quotation marks and citation omitted).

**The Civil Child Abuse and Neglect Processes**

{13}      The civil child abuse and neglect process "addresses situations in which the child has suffered or who is at risk of suffering serious harm because of the action or *inaction* of the child's parent[.]" *Id.* ¶ 13 (emphasis, internal quotation marks and citation omitted) (quoting NMSA 1978, § 32A-4-2(B)(1)).

> When parental conduct or the home environment places a child at risk, the State can use its civil powers to remove the danger to the child, either by allowing the child to remain with the parents subject to their compliance with court-ordered conditions, by removing the child from the home, or by transferring legal custody to another. Importantly, this process contemplates that parents will be afforded . . . an opportunity to comply with a treatment plan before the State proceeds to more drastic remedies[,] . . . the ultimate goal [is] to preserve and reunify the family.

*Id.* ¶ 14 (citation omitted).

6

**The Criminal Child Abandonment Component**

{14}    In 1973, the Legislature enacted a statute criminalizing "abandonment or abuse of a child." 1973 N.M. Laws, ch. 360, § 10; *see* § 30-6-1. Although the statute has since been amended and re-codified, its abandonment provision remains substantially the same. In pertinent part, the abandonment provision states:

> Abandonment of a child consists of the parent, guardian[,] or custodian of a child intentionally leaving or abandoning the child under circumstances whereby the child may or does suffer neglect.

Section 30-6-1(B). "Neglect" is defined to mean that:

> a child is without proper parental care and control of subsistence, education, medical[,] or other care or control necessary for the child's well-being because of the faults or habits of the child's parents, guardian[,] or custodian or their neglect or refusal, when able to do so, to provide them[.]

Section 30-6-1 (A)(2).

{15}    The child abandonment statute does not define the terms "leaving or abandoning." *See* § 30-6-1(B). We have been unable to find any New Mexico authority determining what kind of parental conduct constitutes "leaving or abandoning" a child under Section 30-6-1(B). Thus, we turn to the dictionary for guidance about the "plain meaning" of these terms. *See Boyse*, 2013-NMSC-024, ¶ 9. The word "leave" means "[t]o depart; voluntarily go away" or "[t]o depart willfully

with the *intent not to return*." *Black's Law Dictionary* 767 (9th ed. 2010) (emphasis added). "Abandonment" means "1. The relinquishing of a right or interest with *the intention of never again claiming it. . . . 3. Family law*. The act of leaving a spouse or child willfully and *without an intent to return*." *Id.* at 1-2 (emphasis added).

{16}     These dictionary definitions are consistent with similar definitions we have found in legal encyclopedias discussing criminal child abandonment. *See* 23 Am. Jur. 2d *Dedication to Desertion and Nonsupport* § 30, at 838-39 (2013) ("To constitute abandonment or desertion of a child within the meaning of the statutes making it an offense, there ordinarily must be an actual, voluntary, or willful desertion of the child, without justification and *with an intent to sever the parental relationship entirely*." (emphasis added)); *see also* 67A C.J.S. *Pardon & Parole to Parties* § 381, at 471 (2013) ("The elements of the offense of abandonment of a child are 'desertion,' that is, the willful forsaking and desertion of the duties of parenthood, and 'dependency,' that is, leaving such a child in a dependent condition.").

{17}     A survey of other states' case law reveals that historically, the term "abandonment," as used in statutes criminalizing the abandonment of a child, has been interpreted in a manner consistent with the dictionary and legal encyclopedia definitions above. *See Gay v. State*, 31 S.E. 569, 570 (Ga. 1898) ("[T]o constitute . . . abandonment . . ., there must be an actual desertion, accompanied with an intention

to entirely sever, so far as it is possible to do so, the parental relation, and throw off all obligations growing out of the same."), *superseded by statute as recognized in Bailey v. State*, 105 S.E.2d 320 (Ga. 1958); *State v. Wilson*, 287 N.W.2d 587, 589-91 (Iowa 1980) (concluding that the Iowa general assembly used the term "abandons" in "its usual sense of permanency" and it did not "intend to encompass a temporary absence" where a mother left her eighteen-month-old child unattended in her apartment for ninety minutes while she went to a nearby gas station to talk to her boyfriend was insufficient to prove child abandonment); *City of Cincinnati v. Meade*, 259 N.E.2d 505, 506 (Ohio Ct. App. 1970) (holding that a parent cannot be convicted of child abandonment unless it is "proved beyond a reasonable doubt that there was a willful leaving of his or her child . . . with an intention of causing perpetual separation"); *State v. Laemoa*, 533 P.2d 370, 374 (Or. Ct. App. 1975) ("As applied to our child abandonment statute, abandonment means relinquishing all parental claims to a child and foregoing all parental duties to a child."); *see also State v. Davis*, 70 Mo. 467, 468 (Mo. 1879) (recognizing that abandonment is a statutory offense that "does not mean a mere temporary absence from home, or temporary neglect of parental duty" but requires "an intention of causing perpetual separation").

{18}     Some state courts have recognized that a temporary absence may be sufficient to meet the definition of abandonment. The Pennsylvania Supreme Court concluded

that the criminal child abandonment statute was "designed to punish single episodes that are repugnant to our concept of an orderly society." *Commonwealth v. Skufca*, 321 A.2d 889, 892 (Pa. 1974) (explaining that "the jury was free to find that leaving these minor children of tender years and incapable of protecting themselves unattended for a sustained period, closeted in such a manner that they were denied assistance from without, by a parent who had the duty to provide for their safety and ignored that responsibility for her personal pleasure, fell within the conduct prohibited under [the criminal abandonment statute").

{19} Under the Texas statute, "abandon" is more broadly defined to include "leav[ing] a child in any place without providing reasonable and necessary care for the child, under circumstances under which no reasonable, similarly situated adult would leave a child of that age and ability." Tex. Penal Code Ann. § 22.041(a), (b) (2007)). This definition has also been applied to circumstances that involved a temporary absence. *See Fernandez v. State*, 269 S.W.3d 63, 64 (Tex. App. 2008) (recognizing that the defendant abandoned an infant when she left the infant in a locked car at a parking lot with the windows rolled up for an hour while she was shoplifting inside of a store); *Schultz v. State*, 923 S.W.2d 1, 1-2 (Tex. App. 1996) (en banc) (affirming a conviction for child abandonment where the defendant left her two young children alone in her apartment for fifteen hours and they died in a fire).

Notwithstanding the broad definition of abandonment in Texas, the term has not been construed so broadly to be applied to a circumstance where a parent remains in the same apartment with a child in distress, but ignores the child from another room.

{20}     Other state courts have upheld convictions in situations involving a parental absence that could be identified as temporary, although the question of whether these statutes encompassed temporary or permanent abandonments was not at issue or addressed in these cases. *See In re B.L.M.*, 492 S.E.2d 700, 700-01 (Ga. Ct. App. 1997) (affirming a reckless abandonment of a child conviction where a juvenile who placed her newborn infant in a trash bag, set it out with the garbage on the porch, and went to sleep inside the house); *Jones v. State*, 701 N.E.2d 863, 869 (Ind. Ct. App. 1998) (affirming a conviction for neglect of a dependent by abandonment where a mother left her four-year-old child alone in her apartment for four days and returned to find him dead); *Davis v. State*, 476 N.E.2d 127, 140 (Ind. Ct. App. 1985) (affirming a conviction for neglect of a dependent by abandonment where a mother left her newborn infant "alone by the side of a deserted country gravel road out of the view of [any] passersby").

{21}     We have found no authority, and the State has cited none, to establish that the combined actions by a parent of locking a child in his or her bedroom and then ignoring the child's cries while remaining in the same apartment constitutes the crime

11

of abandonment. *See State v. Ibarra*, 1993-NMCA-040, ¶ 13, 116 N.M. 486, 864 P.2d 302 ("We are entitled to assume, when arguments are unsupported by cited authority, that supporting authorities do not exist."). The State's reliance on *State v. Chavez*, 2007-NMCA-162, 143 N.M. 126, 173 P.3d 48 (*Kimberly Chavez*), is misplaced. Although this Court in *Kimberly Chavez* referenced that the defendant was convicted of one count of "abandonment or abuse of a child[,]" the statutory conviction was for negligent child abuse under Section 30-6-1(D)(1) rather than abandonment under Section 30-6-1(B). *Kimberly Chavez*, 2007-NMCA-162, ¶¶ 4, 13, 17-18, 29. In the present case, the jury found Defendant not guilty of negligent child abuse under Section 30-6-1(D)(1). As a result, it is clear that *Kimberly Chavez* addressed a conviction for negligent child abuse under Section 30-6-1(D)(1) and is not applicable to our analysis of abandonment in this case.

{22} We are persuaded by those cases and authorities that apply the literal and plain meaning of abandonment to conclude that a parent must leave the child without an intent to return to be convicted of criminal child abandonment. This interpretation is consistent with our mandate to "effectuate the intent of the [L]egislature" by "using the plain language of the statute," *Ogden*, 1994-NMSC-029, ¶ 24; to construe criminal statutes "strictly," *Chavez*, 2009-NMSC-035, ¶ 10; and to avoid reading a criminal statute as applying to particular conduct "unless the legislative proscription

is plain," *Bybee*, 1989-NMCA-071, ¶ 12. Therefore, we conclude that to convict a defendant of abandonment under Section 30-6-1(B), there must be sufficient evidence that the defendant left the child without an intent to return.

{23}     The State neither argued nor presented any evidence that Defendant intended to leave Child in his bedroom without an intent to return. By locking Child in his bedroom while Defendant remained inside the same apartment, Defendant has not met the definition of abandonment—leaving without an intent to return. As a result, there was insufficient evidence to support Defendant's child abandonment conviction under Section 30-6-1(B). We note that our holding is consistent with our recent non-binding and unpublished decision in *State v. Charley*, No. 31,911, mem. op. ¶ 24 (N.M. Ct. App. April 17, 2014) (non-precedential) (determining that a "[f]ailure to pick up a child after school does not rise to the type of abandonment contemplated by New Mexico statutory law"). Moreover, Defendant's alleged conduct was consistent with the kind of "inaction" that our Children's Code was designed to consider through other proceedings. *See* § 32A-4-2 (B)(1) (defining "abused child" to mean a child "who has suffered . . . serious harm because of the action or *inaction* of the child's parent." (emphasis added)); *Chavez*, 2009-NMSC-035, ¶ 13.

**Defendant's Jury Instruction Request**

{24}     We note that Defendant requested the jury instruction on abandonment of a

13

child pursuant to Section 30-6-1, and the State did not object to the inclusion of this instruction. The State makes reference to this procedural matter in its appellate brief but does not present any argument, cite relevant case law to assert error, or otherwise develop any issue for further review. We might speculate that this procedural factor has some relevance on appeal. The appellate courts have addressed the issue of invited error when it is properly raised on appeal. *See State v. Clark*, 1989-NMSC-010, ¶¶ 26-29, 103, 108 N.M. 288, 772 P.2d 322 (addressing a failure to object to the arguments and jury instructions in the context of invited error and fundamental error); *State v. Young*, 1994-NMCA-061, ¶¶ 3-6, 117 N.M. 688, 875 P.2d 1119 (declining to address a defendant's challenge to the evidence and the jury instruction that he requested be given). Under the circumstances, however, this Court will not address an undeveloped issue where no authority or argument has been presented on appeal. *See State v. Gutierrez*, 2012-NMCA-013, ¶ 33, 269 P.3d 905 (stating that where a party "fails to cite to any facts in the record or other authority in support of [a] contention," this Court will "decline to review Defendant's undeveloped argument on appeal.")(*rev'd on other grounds*, 2014-NMSC-031, 333 P.3d 247); *State v. Gonzales*, 2011-NMCA-007, ¶ 19, 149 N.M. 226, 247 P.3d 1111 (stating that "this Court has no duty to review an argument that is not adequately developed"); *State v. Fuentes*, 2010-NMCA-027, ¶ 29, 147 N.M. 761, 228 P.3d 1181 (explaining that this

14

Court does not review unclear or undeveloped arguments on appeal that would require this Court to guess at what a party's arguments might be). As a result, we decline to consider this procedural matter further.

**CONCLUSION**

{25}     Defendant's conviction for the crime of child abandonment is reversed. This matter is remanded to the district court to effectuate the dismissal of Defendant's conviction and the sentence imposed upon her.

{26}     **IT IS SO ORDERED.**


_____

**TIMOTHY L. GARCIA, Judge**

**WE CONCUR:**


_____

**JAMES J. WECHSLER, Judge**


_____

**JONATHAN B. SUTIN, Judge**

15