# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number:_____**

**Filing Date:   September 26, 2016**

**NO.  S-1-SC-35035**

**STATE OF NEW MEXICO,**

 Plaintiff-Petitioner,

v.

**JENNIFER STEPHENSON,**

 Defendant-Respondent.

**ORIGINAL PROCEEDING ON CERTIORARI**
**Michael E. Vigil, District Judge**

Hector H. Balderas, Attorney General
Joel Jacobsen, Assistant Attorney General
Maris Veidemanis, Assistant Attorney General
Santa Fe, NM

for Petitioner

Bennett J. Baur, Chief Public Defender
B. Douglas Wood, III, Assistant Appellate Defender
Santa Fe, NM

for Respondent

**OPINION**

**CHÁVEZ, Justice.**

{1}    Defendant Jennifer Stephenson placed her two-year-old son Isaiah in his room at bedtime and locked the door for the night. Isaiah's father heard Isaiah whimpering the next morning and found him with his legs pinned between a dresser and a crossbar on Isaiah's bed. Isaiah developed a painful condition described as compartment syndrome, which required an aggressive surgery to correct. A jury convicted Defendant of one count of abandonment of a child resulting in great bodily harm, a second-degree felony, contrary to NMSA 1978, Section 30-6-1(B) (2009), after being unable to find that Defendant committed child abuse by failing to act for Isaiah's welfare and safety, contrary to Section 30-6-1(D). The Court of Appeals reversed Defendant's conviction, holding that her conduct did not fall within the meaning of "leaving or abandoning" because she did not leave Isaiah with the intent not to return. *State v. Stephenson*, 2015-NMCA-038, ¶¶ 23, 25, 346 P.3d 409. We granted the State's petition for writ of certiorari to determine whether the Court of Appeals' definition of "leaving or abandoning" was correct and whether the evidence was sufficient as a matter of law to support the conviction. 2015-NMCERT-001.

{2}    We conclude that the Legislature intended the crime of abandonment of a child under Section 30-6-1(B) to include the situations (1) where a parent intentionally

leaves a child with the intent not to return, whereby the child may or does suffer neglect, which would constitute "abandoning"; and (2) where a parent or other caregiver intentionally departs from a child, leaving the child under circumstances whereby the child may or does suffer neglect, which would constitute "leaving." Thus, we interpret Section 30-6-1(B) differently than the Court of Appeals. The dissent offers a third interpretation of Section 30-6-1(B)—as causing a child to remain in some specified condition—which we interpret to be consistent only with the crime of permitting child abuse by failing to act for the child's safety, a crime that the jury rejected. Perhaps the most important lesson from this case is that the Legislature must clarify its intent with respect to the crime of child abandonment. Nevertheless, we agree with the Court of Appeals that Defendant could not be found guilty of abandoning Isaiah because there is no evidence that Defendant intentionally left Isaiah with the intent not to return. We also conclude that there was not sufficient evidence to support the finding that Defendant intentionally departed from Isaiah, leaving him under circumstances where Isaiah might have or did suffer neglect—where his well-being was at risk of harm. We therefore reverse Defendant's conviction and remand for an entry of a judgment of acquittal.

**BACKGROUND**

2

{3} Anthony Apodaca, Isaiah's father, worked the late night shift until 1:30 a.m. the morning of January 28, 2010. Anthony arrived at Defendant's apartment at approximately 2:00 a.m., and because the door was locked, he knocked to awaken Defendant to let him into the apartment. Anthony was hungry, so he asked Defendant to go to McDonald's to get him some food. Meanwhile Anthony went into his daughter Neveah's room and found her awake on the floor outside her crib, so he picked her up to feed her a bottle of milk. He did not check on Isaiah, his son, because he assumed that Isaiah was asleep and Anthony did not want to disturb him. Isaiah had been locked in his room for the night.

{4} After Defendant returned with food from McDonald's, Anthony shared his food with Neveah before putting her back to sleep in her crib. Anthony asked Defendant to check on Isaiah. Defendant told Anthony that Isaiah was fine, but it is not clear whether she actually checked on him, although in her statement to the police, Defendant said that Isaiah was asleep when she checked on him at 2:30 a.m. Anthony did not check on Isaiah that night. Both parents went to sleep and did not leave the apartment after Defendant returned from McDonald's. There is no evidence that the parents heard Isaiah crying or screaming when they went to bed or in the middle of the night. Anthony testified that he woke up in the middle of the night and

3

did not hear Isaiah crying or screaming.

{5}    Anthony woke up the next morning around 7:00 a.m. and heard Isaiah whimpering, so he unlocked Isaiah's bedroom door and saw Isaiah pinned between a dresser and a crossbar from his toddler bed. Anthony could tell that Isaiah's legs were swollen and reddish purple and that he was in pain. Defendant took Isaiah to the hospital after picking up her father, Calvin Stephenson, on the way to the hospital. Calvin testified that Isaiah whimpered but did not cry on the way to the hospital.

{6}    Dr. Meher Best was the first doctor to see Isaiah at the hospital and he could immediately tell that Isaiah was in pain. Isaiah's lower extremities were unusually hard with strange marks and lesions that later proved to be pressure lesions from being pinned for a prolonged time. Isaiah did not have bruises or broken bones which Dr. Best would have expected to see if a toddler suffered a crush injury from a dresser. By the time Isaiah was in the emergency room, he was "inconsolable."

{7}    Isaiah was diagnosed with compartment syndrome of both legs as a result of being pinned between the dresser and the crossbar on his toddler bed. There is no evidence as to how the dresser actually fell on Isaiah, although Anthony testified that Isaiah liked to climb on furniture.

{8}    Compartment syndrome usually results from a crush injury that can be limb-

4

or even life-threatening. Several medical doctors testified that compartment syndrome takes hours to develop. The orthopedic surgeon who treated Isaiah testified that he thought Isaiah would have had to have been trapped for at least "eight to twelve hours and, more likely, twenty-four hours." The pediatric intensive care doctor testified that she thought Isaiah would have been trapped for "a minimum of six to twelve hours." The doctors agreed that it was extremely rare to see compartment syndrome in a child.

{9} Isaiah underwent a fasciotomy, which is a surgery performed by slicing open the legs, removing the dead muscle tissue, and leaving the swollen muscles exposed outside of the skin until the muscles recede back into their respective compartments. Once the muscles recede, skin grafts are required to replace the skin that was removed during the fasciotomy. Isaiah needed a walker to help him walk for some time and his lower legs will be disfigured for the rest of his life.

{10} Dr. Best reported Defendant to the authorities for potential child abuse because although Defendant was polite, Dr. Best thought Defendant's reaction to her child being in such serious condition was too casual. Defendant was indicted for negligently causing, or in the alternative, negligently permitting Isaiah to be placed in a situation which endangered his life or health, when Defendant knew or should

have known of the danger involved and acted with reckless disregard for Isaiah's safety, in violation of Section 30-6-1(D).

{11} At trial the State abandoned the count for negligently *causing* child abuse and pursued the count for negligently *permitting* child abuse. The district court instructed the jury that if it had a reasonable doubt as to whether Defendant committed the crime of negligently permitting child abuse resulting in great bodily harm, then the jury should consider the crime of abandonment resulting in great bodily harm. The jury returned a verdict finding Defendant guilty of abandonment.

**DISCUSSION**

{12} The question we must address is whether the evidence was sufficient to convict Defendant of abandonment resulting in great bodily harm. The answer to this question depends on the scope intended by the Legislature for the crime of abandonment. *State v. Rowell*, 1995-NMSC-079, ¶ 8, 121 N.M. 111, 908 P.2d 1379 ("The main goal of statutory construction is to give effect to the intent of the legislature."). "Questions of statutory interpretation are reviewed de novo . . . ." *State v. Tafoya*, 2012-NMSC-030, ¶ 11, 285 P.3d 604. A criminal statute must be strictly construed and "may not be applied beyond its intended scope [for] it is a fundamental rule of constitutional law that crimes must be defined with appropriate

definiteness." *State v. Chavez*, 2009-NMSC-035, ¶ 10, 146 N.M. 434, 211 P.3d 891 (internal quotation marks and citation omitted). Therefore, we will not read a criminal statute to apply to particular conduct "unless the legislative proscription is plain." *State v. Bybee*, 1989-NMCA-071, ¶ 12, 109 N.M. 44, 781 P.2d 316 (citing *United States v. Scharton*, 285 U.S. 518 (1932)). "We are generally unwilling to construe one provision of a statute in a manner that would make other provisions null or superfluous." *State v. Rivera*, 2004-NMSC-001, ¶ 18, 134 N.M. 768, 82 P.3d 939.

{13} Section 30-6-1(B) defines "abandonment" as a "parent, guardian or custodian of a child intentionally leaving or abandoning the child under circumstances whereby the child may or does suffer neglect." Neglect means that a child is without proper parental care and control necessary for the child's well-being, including the child's health, education, or subsistence. Section 30-6-1(A)(2). The statute does not define "leaving or abandoning." *See* § 30-6-1. Thus, to determine whether Defendant's conviction was supported by sufficient evidence, we must first examine the scope of Section 30-6-1(B), and in particular, must for the first time ascertain the definitions of "leaving" and "abandoning" as they are used in Section 30-6-1(B).

{14} The Court of Appeals referred to *Black's Law Dictionary* for the definitions of "leave" and "abandonment" because what constitutes leaving or abandoning under

Section 30-6-1 is a matter of first impression in New Mexico. *Stephenson*, 2015-NMCA-038, ¶ 15. *Black's Law Dictionary* (9th ed. 2009) defines "leave" as "[t]o depart; voluntarily go away" or "[t]o depart willfully with *the intent not to return*," *id.* at 973 (emphasis added), and "abandonment" as "[t]he relinquishing of a right or interest with *the intention of never reclaiming it*," or "[t]he act of leaving a spouse or child willfully and *without an intent to return*," *id.* at 2 (emphasis added). *See Stephenson*, 2015-NMCA-038, ¶ 15. The Court of Appeals also compared the dictionary definitions of "abandonment" with definitions provided by legal encyclopedias and concluded that all definitions of "abandonment" require deserting the child with the intent to never return. *See Stephenson*, 2015-NMCA-038, ¶ 16. The Court of Appeals did not discuss the definition of "leaving" at length, nor did it address the disjunctive nature of "leaving or abandoning" in Section 30-6-1(B). *See Stephenson*, 2015-NMCA-038, ¶¶ 15-16. We conclude that a principled distinction exists between "leaving" and "abandoning," and therefore, to avoid rendering either word superfluous, each word must be construed consistent with the Legislature's intent, which was to create independent theories of criminal culpability for both "leaving" and "abandoning."

**The Legislature intended "leaving" in Section 30-6-1(B) to create an independent theory of criminal culpability distinct from "abandoning"**

**{15}** We must interpret criminal statutes consistent with the purpose of the legislation and the evils sought to be addressed by giving legislative language a reasonable and common-sense construction. *State v. Morales*, 2010-NMSC-026, ¶ 13, 148 N.M. 305, 236 P.3d 24. The purpose of Section 30-6-1 is to protect children from harm. *See State v. Lujan*, 1985-NMCA-111, ¶ 16, 103 N.M. 667, 712 P.2d 13.

**{16}** To ascertain the common-sense meaning of the terms "leave" and "abandon" in Section 30-6-1, we turn to the dictionary for guidance. *See State v. Segotta*, 1983-NMSC-092, ¶ 8, 100 N.M. 498, 672 P.2d 1129 ("We, as other courts, often make reference to dictionaries and to the case law to determine the probable legislative intent in using a particular word." (internal quotation marks and citation omitted)). The definitions of "leave" that are consistent with the intent of the legislation are "to take leave of or withdraw oneself from *whether temporarily or permanently*:  go away or depart from" and "to cause to be or remain in some specified condition." *Webster's Third New International Dictionary of the English Language Unabridged* 1287 (1971) (emphasis added). The definition of "abandon" that is consistent with the intent of the legislation is "to forsake or desert [especially] in spite of an allegiance, duty, or responsibility:  withdraw one's protection, support, or help from." *Webster's Third New International Dictionary of the English*

9

*Language Unabridged* 2 (1971). A juror relying on the ordinary meaning of the word "abandon" could reasonably conclude that for a parent to abandon a child, he or she must have left the child with the intent of never returning. The State argues that adding an intent never to return even to the word "abandon" does not make sense because the statute also applies to someone who is temporarily responsible for the care and protection of the child. We agree that if the purpose of the statute is the protection of children, *Lujan*, 1985-NMCA-111, ¶ 16, it should not matter whether the defendant was permanently or temporarily responsible for the custody and control of the child. However, the Legislature addressed this concern by eliminating any ambiguity with respect to the purpose of its legislation and the evil it sought to address—exposing the well-being of a child to harm—by making it a crime for a person who has custody and control of the child to either temporarily or permanently leave the child without the control and protection necessary to prevent harm to the child. Section 30-6-1(B) criminalizes either intentionally "*leaving*"—even temporarily—or intentionally "*abandoning*" a child, but only under circumstances where doing so exposes the child to a risk of harm, whether to the child's health, education, or subsistence. *See id.* (emphasis added). We hold that a parent, guardian, or custodian who simply departs from the child does not violate the statute unless at

the time the parent, guardian, or custodian departs from the child, the circumstances are such that the child's well-being is at risk of harm.

**The evidence was not sufficient to find Defendant guilty of leaving or abandoning her child**

{17}    The Court of Appeals concluded that the evidence did not support the guilty verdict of abandonment because although Defendant locked Isaiah in his bedroom, she remained in the apartment, and therefore the State did not prove that Defendant left Isaiah without an intent to return. *Stephenson*, 2015-NMCA-038, ¶ 23.  We have already held that the State does not have to prove that Defendant left Isaiah with the intent not to return.  The question is whether there was sufficient evidence for a reasonable juror to find that Defendant intentionally left Isaiah at a time and under circumstances when Isaiah's well-being was at risk of harm.  We must view the evidence in the light most favorable to the verdict, indulging all permissible inferences in favor of the verdict and disregarding all evidence and inferences opposed to the verdict. *State v. Treadway*, 2006-NMSC-008, ¶ 7, 139 N.M. 167, 130 P.3d 746.  We will not "weigh the evidence or substitute [our] judgment for that of the fact finder as long as there is sufficient evidence to support the verdict." *State v. Mora*, 1997-NMSC-060, ¶ 27, 124 N.M. 346, 950 P.2d 789, *abrogated on other grounds by Kersey v. Hatch*, 2010-NMSC-020, ¶ 17, 148 N.M. 381, 237 P.3d 683.

{18} We preface our discussion of the sufficiency of the evidence by revisiting the relevant procedural history of this case. Defendant was indicted for negligently causing, or in the alternative, negligently permitting Isaiah to be placed in a situation which endangered his life or health, when Defendant knew or should have known of the danger involved and acted with reckless disregard for Isaiah's safety, both in violation of Section 30-6-1(D). Causing and permitting child abuse are two distinct legal concepts. *State v. Leal*, 1986-NMCA-075, ¶ 14, 104 N.M. 506, 723 P.2d 977. " '[P]ermit' refers to the proscribed act, the passive act of allowing the abuse to occur." *Id.* ¶ 19. "[C]*ausing* child abuse is synonymous with inflicting the abuse." *State v. Nichols*, 2016-NMSC-001, ¶ 33, 363 P.3d 1187. When the endangerment is allegedly based on medical neglect, the appropriate theory is *causing* the child's life or health to be endangered by medical neglect. *Id.* ¶ 35.

{19} During trial the State abandoned the count for negligently *causing* child abuse and pursued the count for negligently *permitting* child abuse. The district court also instructed the jury on abandonment. The district court gave this instruction, despite the fact that neither party believed that abandonment is a true lesser-included offense of permitting child abuse. The district court considered the instruction because Defendant argued that pursuant to *State v. Darkis*, she was entitled to a step-down

instruction on the lesser offense of abandonment because the evidence and the State's theory fit that crime. *See* 2000-NMCA-085, ¶¶ 14-20, 129 N.M. 547, 10 P.3d 871 (recognizing that *State v. Meadors*, 1995-NMSC-073, ¶ 12, 121 N.M. 38, 908 P.2d 731 provides the test for determining when a court should grant the State's request for an instruction on a lesser-included offense, and concluding that "a defendant's right to a lesser-included offense instruction is effectively greater than the State's"). The district court agreed with Defendant and granted her request to give the jury a step-down instruction from permitting child abuse to child abandonment. Because neither party challenges the district court's ruling that Defendant was entitled to the abandonment instruction, we do not decide that issue here.

{20} The district court instructed the jury that to find Defendant guilty of negligently permitting child abuse resulting in great bodily harm, the State had to prove beyond a reasonable doubt that:

1. The Defendant permitted Isaiah Apodaca to be placed in a situation which endangered the life or health of Isaiah Apodaca;

2. The Defendant acted with reckless disregard. To find that the Defendant acted with reckless disregard, you must find that the Defendant knew or should have known that her failure to act created a substantial and foreseeable risk, that she disregarded that risk and that she was wholly indifferent to the consequences of her failure to act, and to the welfare and safety of Isaiah Apodaca;

13

3. The Defendant was a parent, guardian or custodian of the child, or the Defendant had accepted responsibility for the child's welfare;

4. The Defendant's failure to act resulted in great bodily harm to Isaiah Apodaca;

5. Isaiah Apodaca was under the age of 18; and

6. This happened in New Mexico on or between the 27th day of January 2010 and the 28th day of January 2010.

{21} The State's ultimate theory of the case was that although the dresser falling on Isaiah was an accident, Defendant's failure to respond to the cries and screams the doctors would have expected from Isaiah is what permitted Isaiah to be placed in a situation that endangered his life or health. According to the State, Defendant's failure to act was with reckless disregard because she knew or should have known that her failure to act created a substantial and foreseeable risk to Isaiah. We note that this instruction tracked UJI 14-603 NMRA (2010, withdrawn effective April 3, 2015). In *State v. Consaul* we recently called into question the legal accuracy of the uniform jury instructions for crimes under Section 30-6-1, *see* 2014-NMSC-030, ¶ 35, 332 P.3d 850, and the instruction has since been modified by UJI 14-615 NMRA. However, we need not address this concern because the jury did not find Defendant guilty under the State's theory that she negligently permitted child abuse.

14

{22} The district court instructed the jury that if it had a reasonable doubt as to whether Defendant committed the crime of negligently permitting child abuse resulting in great bodily harm, then the jury should consider the crime of abandonment resulting in great bodily harm. We presume that the jury followed this instruction, *see Britton v. Bouldon*, 1975-NMSC-029, ¶ 6, 87 N.M. 474, 535 P.2d 1325, and because the jury proceeded to find Defendant guilty of abandonment, the jury had a reasonable doubt as to whether Defendant negligently permitted child abuse.[1]

{23} The district court instructed the jury that to find Defendant guilty of abandonment of a child resulting in great bodily harm, the State had to prove beyond a reasonable doubt that:

1. Jennifer Stephenson was a parent of Isaiah Apodaca;

2. Jennifer Stephenson intentionally *left or abandoned* Isaiah Apodaca;

3. As a result of Jennifer Stephenson's *leaving or abandoning* Isaiah Apodaca, Isaiah Apodaca was without proper parental care and

---

[1] If child abandonment is a lesser-included offense of negligently permitting child abuse, an issue we do not decide, the jury's verdict is an implicit acquittal of negligently permitting child abuse. *See State v. Medina*, 1975-NMCA-033, ¶ 8, 87 N.M. 394, 534 P.2d 486 (citing *State v. Goodson*, 1950-NMSC-023, ¶ 9, 54 N.M. 184, 217 P.2d 262 (stating that it is well settled in New Mexico that a conviction of a lesser-included offense is an implicit acquittal of a greater offense)).

control necessary for Isaiah Apodaca's well-being;

4. Jennifer Stephenson had the ability to provide proper parental care and control necessary for Isaiah Apodaca's well-being;

5. Jennifer Stephenson's failure to provide proper parental car[e] and control necessary for Isaiah Apodaca's well-being resulting in great bodily harm to Isaiah Apodaca;

6. Isaiah Apodaca was under the age of 18;

7. This happened in New Mexico on or between the 27th and 28th days of January 2010.

(Emphasis added.)

{24}   The State contends that the "most reasonable inference from the evidence is that Defendant left the apartment, leaving Isaiah alone, for the first part of the evening and night, including the time period when the dresser fell on Isaiah's legs." The State asserts that Defendant did not testify, and therefore her whereabouts are not accounted for until Anthony arrived at 2:00 a.m. The State further explains that the reasonable inference that Defendant left Isaiah alone in the apartment is supported by the testimony of multiple doctors who would have expected Isaiah to scream, and therefore Isaiah must have screamed, only quieting through exhaustion and despair once he realized that his screams were futile. Because Defendant did not hear screams, the State argues that the reasonable inference is that she was not in the

apartment. The State also contends that even if Defendant did not leave the apartment, she still left Isaiah unattended while he was screaming.

{25} Defendant cites *State v. Vigil*, 1975-NMSC-013, ¶ 12, 87 N.M. 345, 533 P.2d 578 for the proposition that mere speculation cannot support a guilty verdict, and contends that it is pure speculation that she left Isaiah alone in the apartment. Defendant also notes that the jury was instructed not to draw any inferences from the fact that she did not testify, and the jury is presumed to follow jury instructions. Defendant emphasizes that Anthony did not hear Isaiah scream, and argues that Isaiah likely did not scream during the night because compartment syndrome takes a considerable amount of time to become painful.

{26} We conclude that there was not sufficient evidence for a reasonable juror to find that at the time Defendant put Isaiah in his bedroom, intentionally departing from him, the circumstances were such that Isaiah's well-being was at risk of harm. The State's contention that the evidence supports a reasonable inference that Defendant left the apartment is not tied to the facts in the case, and is therefore speculative. " '[E]vidence from which a proposition can be derived only by speculation among equally plausible alternatives is not substantial evidence of the proposition.' " *State v. Slade*, 2014-NMCA-088, ¶ 14, 331 P.3d 930 (quoting *Baca v. Bueno Foods*, 1988-

17

NMCA-112, ¶ 15, 108 N.M. 98, 766 P.2d 1332), *cert. granted*, 2014-NMCERT-008, *cert. quashed*, 2015-NMCERT-001. The evidence before the jury was that Defendant put Isaiah to bed for the night and locked his bedroom door. According to Anthony, he and Defendant exchanged numerous text messages throughout the night, and Defendant eventually invited him to spend the night with her once he got off work. In Defendant's statement to the police, she stated that she did not hear any screaming or crying from Isaiah that night. Anthony also testified that he did not hear any screaming or crying.

{27} Defendant departed from Isaiah the moment she put him in his room. There is no evidence that the dresser that had been in Isaiah's room for months was wobbly or unsteady, or that he had climbed on the dresser in the past. There is no evidence that Isaiah's well-being was in jeopardy if he was left alone in his room to go to sleep. During closing arguments, the State emphasized that Isaiah had to have been screaming and Defendant ignored him. However, this evidence is relevant only to the question of whether Defendant permitted Isaiah to be in a situation that endangered his health or life, which the jury determined she did not. It is not relevant to Defendant placing Isaiah in his room for the night.

{28} Our review of the sufficiency of the evidence takes into account "both the

18

jury's fundamental role as factfinder" and our independent responsibility to ensure that a jury's conviction of a defendant is supported "by evidence in the record, rather than mere guess or conjecture." *State v. Flores*, 2010-NMSC-002, ¶ 2, 147 N.M. 542, 226 P.3d 641. In this case, we conclude that there was not sufficient evidence to support the conviction for child abandonment. Because the crime of leaving or abandoning a child is at a minimum a misdemeanor, and possibly a felony if the child suffers great bodily harm or death, and we have noted that by creating criminal liability under Section 30-6-1, "the Legislature did not intend to criminalize conduct creating 'a mere possibility, however remote, that harm may result' to a child," *State v. Graham*, 2005-NMSC-004, ¶ 9, 137 N.M. 197, 109 P.3d 285 (citation omitted), we cannot affirm Defendant's conviction. Indeed, to uphold Defendant's conviction could potentially criminalize parents' actions every single time they tuck their children into bed and harm befalls their children at night through some unfortunate accident, which we refuse to do.

**CONCLUSION**

{29} We affirm the result reached by the Court of Appeals and remand to the district court for entry of a judgment of acquittal.

{30} **IT IS SO ORDERED.**

19

_____

**EDWARD L. CHÁVEZ, Justice**

**WE CONCUR:**

_____

**CHARLES W. DANIELS, Chief Justice**

_____

**BARBARA J. VIGIL, Justice**

**JUDITH K. NAKAMURA, Justice, concurring in part and dissenting in part**

**PETRA JIMENEZ MAES, Justice, joining in special concurrence and dissent**

20

**Nakamura, Justice (concurring in part and dissenting in part).**

{31} An appellate court's review of whether sufficient evidence supports a jury's verdict is settled: We draw every reasonable inference in favor of the verdict and then evaluate whether the evidence, so viewed, supports the verdict beyond a reasonable doubt. *E.g.*, *State v. Cantrell*, 2008-NMSC-016, ¶ 26, 143 N.M. 606, 179 P.3d 1214. Under this standard of review, a rational jury could have found beyond a reasonable doubt that Stephenson violated NMSA 1978, Section 30-6-1(B) (2009) by intentionally leaving Isaiah under circumstances whereby Isaiah suffered neglect. Accordingly, I respectfully dissent.

{32} The Legislature intended "leaving" and "abandoning" to create independent theories of criminal culpability under Section 30-6-1(B). The majority concludes that, when enacting Section 30-6-1(B), the Legislature intended "leaving" to reflect its ordinary, dictionary definitions—i.e., first, " 'to take leave of or withdraw oneself from whether temporarily or permanently: go away or depart from' " and, second, " 'to cause to be or remain in some specified condition.' " Maj. Op., ¶ 16 (quoting *Webster's Third New International Dictionary of the English Language Unabridged* 1287 (1971) (emphasis omitted)). I agree that the Legislature intended "leaving" to denote these dictionary definitions. I also agree that there was insufficient evidence

21

for the jury to convict under the first definition of "leaving": *At the time* Stephenson put Isaiah to bed and locked the door, there was not sufficient evidence for a reasonable jury to conclude that she left Isaiah under circumstances in which he may have suffered or did in fact suffer neglect.

{33} Yet, I disagree with the majority's ultimate conclusion that there was insufficient evidence to support the jury's finding that Stephenson intentionally left Isaiah under circumstances whereby he suffered neglect. At some point during the night, the dresser fell upon Isaiah and pinned his legs to the crossbar of his toddler bed. Sufficient evidence was presented at trial for a reasonable jury to find that Stephenson both apprehended that Isaiah was injured and intentionally left him in that condition. In other words, Stephenson "caused" Isaiah "to remain in some specified condition"—i.e., pinned underneath the dresser, expressing his pain, for many, many hours. *Leave*, *Webster's Third New International Dictionary of the English Language Unabridged* 1287 (1971)). In light of this second dictionary definition of "leave," the Legislature could not have intended the statute to focus exclusively on the moment a parent or guardian initially departs from a child. The statute is also implicated where a parent or guardian knows that a child is in peril (even if in the next room) and intentionally *leaves* that child in peril.

{34} Under the second dictionary definition of "leaving" that the Legislature intended in Section 30-6-1(B), sufficient evidence supports the jury's verdict. The jury heard testimony regarding the grave and abnormal extent of Isaiah's injuries. As a result of being trapped underneath the dresser, Isaiah suffered compartment syndrome. The jury heard testimony from Dr. Dale Hoekstra, M.D., an orthopedic surgeon with University of New Mexico's Children's Hospital (U.N.M.H.) and medical director of Carrie Tingley Hospital in Albuquerque. Dr. Hoekstra testified that compartment syndrome "is a condition that arises as a result of an injury to an extremity, almost invariably between the knee and the ankle, in which the pressures in the leg build up to the point that the blood can no longer supply the muscles in the leg, and they start to die or necrose." Elevated creatine kinase ["CK"] levels in Isaiah's blood indicated that Isaiah suffered from compartment syndrome. Dr. Hoekstra testified that the normal range for CK is between 72 to 367 units, and at 9:57 a.m., shortly after his arrival, Isaiah's CK level was 36,605 units, which indicated extensive trauma that threatened the loss of Isaiah's legs and the failure of Isaiah's kidneys. Because Isaiah urgently needed the care of a pediatric nephrologist, pediatric surgeons, and pediatric intensive care doctors, Isaiah was airlifted from Christus St. Vincent Hospital in Santa Fe to U.N.M.H. in Albuquerque. Once Isaiah

arrived at UNMH, his CK peaked at 123,000 units. At UNMH, Dr. Hoekstra performed an emergency fasciotomy on both of Isaiah's legs and found extensive damage, including some tissue death, in Isaiah's leg muscles.

{35} The jury was also presented with evidence establishing that, in order for Isaiah to have developed such an extraordinarily high CK level, Isaiah had to have been trapped under the dresser for eight to twelve hours. Dr. Hoekstra opined that the extent of Isaiah's injuries indicated that Isaiah had been pinned under the dresser for "at least twelve hours." Dr. Denise Coleman, M.D., a pediatric critical care physician at U.N.M.H., who observed Isaiah immediately before his surgery, conservatively estimated that Isaiah was pinned under the dresser for "a minimum of six to twelve hours."

{36} The jury also heard testimony from *Stephenson's* expert witness, Dr. Steven Gabaeff, M.D., who is board certified in emergency medicine and operates a clinical forensic medical practice. Even Dr. Gabaeff testified that Isaiah's CK levels were the highest he had ever seen and estimated that Isaiah's "muscles had no oxygen for a very long time to get that condition." Dr. Gabaeff estimated that Isaiah had been pinned under the dresser for four-and-a-half to eight hours, that "[i]t could have been a little longer even," and that "[b]ased on the [CK levels] going so high, [he] tended

24

to really believe that it was on the longer side." Dr. Gabaeff further opined that "if something happen[ed], say, at 10:30 or 11:00 or 11:30, you know, we're talking about eight hours, and that seems to me to be about what I'd expect . . . we already have numbers that, you know, lead us in a direction." Therefore, from the expert testimony presented by the State and by Stephenson, the jury was permitted to find that Isaiah was underneath the dresser for eight to twelve hours. Consequently, the jury was permitted to infer that the dresser fell on Isaiah between 10:30 p.m. and 11:00 p.m. and remained on top of him until 7:00 a.m. the next morning.

{37} Critically, the jury was presented with additional evidence from which it was permitted to infer the following two findings: First, Isaiah would have expressed audible and sustained indications of pain. Second, Stephenson was both home and awake throughout the night and into the morning, during the time that Isaiah was pinned and expressing pain. Dr. Coleman testified that Isaiah would have been able to scream and that "he would have been in pain for a very long time." Dr. Coleman further testified that the impairment of blood flow in Isaiah's legs would have caused him extreme pain and compared Isaiah's pain to the pain of having an arterial blood clot. Dr. Coleman referenced her training in critical care in Seattle, where she cared for children who had been pinned under fallen trees during the course of lumbering

accidents, and testified, "[I]t's painful. Oftentimes, the pain never goes away. . . . I can tell you it hurt until they could get I.V. pain meds."

{38} Apodaca, Isaiah's father, testified that he worked that night from 6:00 p.m. until 1:25 a.m. or 1:30 a.m. and that he received text messages from Stephenson during the "whole time [he] was working" in which Stephenson invited Apodaca to come spend the night with her at her apartment. Apodaca went to Stephenson's apartment after he left work and arrived at approximately 2:00 a.m. She was home. Upon Apodaca's request, Stephenson went to McDonald's to buy some food. Stephenson returned home at approximately 2:45 a.m. Apodaca asked Stephenson to check on Isaiah at about 3:00 a.m. Stephenson and Apodaca then ate, had sex, and went to sleep at approximately 4:00 a.m. or 4:15 a.m.

{39} From this evidence, the jury was permitted to draw reasonable inferences to reach its verdict. The jury was permitted to rely on the medical expert testimony—and on its common sense and experience—to infer from the severity of Isaiah's injuries, coupled with the shock and pain that a falling dresser would cause to a toddler, that Isaiah cried and screamed loudly, for a prolonged duration. The jury was permitted to infer—based on the estimations of Doctors Hoekstra, Coleman, and Gabaeff—that during the entire time from Apodaca's arrival to the time of their going

26

to sleep, Isaiah was pinned underneath a dresser, enduring and expressing his pain. Based on those same estimations, the jury was entirely free to reject Stephenson's affidavit testimony that she checked on Isaiah at 2:00 a.m., and that he was fine. The jury was rather permitted to infer that, given the severity of Isaiah's injuries and the copious medical expert testimony as to the cause of those injuries, at 2:00 a.m. Isaiah was pinned under the dresser. The jury was also permitted to rely on its common sense to infer that the type of crying and screaming that Isaiah expressed as the dresser fell upon him and as his muscle tissue was dying was abnormal—different in both kind and duration from the type of crying that a follower of Dr. Ferber's method of parenting may recognize as normal. And the jury was permitted to find that if Isaiah had expressed his pain, Stephenson would have heard it. Detective Van Etten testified that Stephenson's apartment was small, such that "anybody would be able to hear anybody from one end of the apartment to the other." In sum, the jury was permitted to find that Stephenson intentionally left Isaiah under circumstances whereby he suffered neglect.

{40} The majority worries that a decision which upholds the jury's verdict "could potentially criminalize parents' actions every single time they tuck their children into bed and harm befalls their children at night through some unfortunate accident." Maj.

27

Op., ¶ 28. While I understand this concern, I do not share it. Two bulwarks prevent a decision upholding the jury's verdict from threatening well-meaning parents with criminal liability. First, to establish a violation of Section 30-6-1(B), the State must prove that the child is exposed to *neglect*, which is specifically defined by Section 30-6-1(A)(2), and which clearly excludes criminal liability for accidental injuries that befall children unbeknownst to well-meaning parents. Second, and more fundamentally, it is the hard and jagged facts of cases which prevent legal conclusions from tumbling down the slippery slope. For example, in this case, the jury had much more to consider than just the scenario of a parent putting a child down to sleep for the night, only to wake up in the morning to discover that the child had experienced some injury as a result of an accident unbeknownst to the parent. Here, the jury was permitted to infer that Stephenson knew Isaiah was suffering an abnormal degree of pain but, nevertheless, intentionally *left* him in that condition. Drawing every reasonable inference in favor of the verdict, as we are required to do, the jury had sufficient evidence to make that finding.

{41}    Accordingly, I respectfully dissent.


_____
**JUDITH K. NAKAMURA, Justice**

28

**I CONCUR:**

_____

**PETRA JIMENEZ MAES, Justice**